Louis Schwartz v. Commissioner.Schwartz v. CommissionerDocket No. 81217. 1United States Tax CourtT.C. Memo 1962-227; 1962 Tax Ct. Memo LEXIS 80; 21 T.C.M. (CCH) 1192; T.C.M. (RIA) 62227; September 26, 1962*80 Petitioner, a textile jobber during the years 1946 and 1947, in addition to the sales made by him through his regular business, which were fully reported in income, transacted 27 sales through various fictitious named companies which were not reported in income for these years. Held: That petitioner understated his net income from sales for the taxable years 1946 and 1947. Held, further: That a part of the deficiency for each year was due to fraud with intent to evade tax. Donald Steinberg, Esq., and*81 Joseph Steinberg, Esq., for the petitioner. Theodore E. Davis, Esq., and Joseph M. Touhill, Esq., for the respondent. FISHERMemorandum Findings of Fact and Opinion FISHER, Judge: This proceeding involves deficiencies in income tax and additions to tax determined against petitioner as follows: Additions to Tax,I.R.C. 1939Sec.Sec. 294YearDeficiency293(b)(d)(2)1946$128,259.62$64,129.81$7,701.791947544.99272.50Totals$128,804.61$64,402.31$7,701.79The issues for our consideration are: (a) Whether, and to what extent petitioner omitted taxable income from his returns for the years 1946 and 1947; (b) whether any part of the deficiency for each year is due to fraud with intent to evade tax; (c) whether the deficiencies are barred by the statute of limitations; and (d) whether petitioner is liable for additions to tax under section 294(d)(2) for substantial underestimation of the estimated tax for the year 1946. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. During the years 1946 and 1947, the only years in issue, Louis Schwartz, hereinafter*82 referred to as the petitioner, had been engaged in the jobbing business of piece goods and clothing materials, under the name of General Fabrics Exchange, located in New York City. Petitioner would buy textiles and resell them as an independent jobber rather than as an agent or broker for the supplier. Petitioner had been engaged in such business since 1926. Benjamin Teperberg, an acquaintance of petitioner, was engaged as a salesman in the textile industry in the early 1940's until the firm which employed him was closed. Teperberg, thereafter, encouraged a friend of his, William Eisenberg (a/k/a William Ainsberg), a bookkeeper without any knowledge of the textile business, to join him in the operation of a billing service through which sales could be fully transacted. According to a prearranged plan, Eisenberg registered, at different times, various trade names, including those of Apex Fabrics, Spartan Fabrics, Velmar Company, Venita Company and Sarona Company, the only accounts in issue. Teperberg during this time had maintained his checking account at the Modern Industrial Bank in New York City and was acquainted with its assistant manager, Irving Cohen. Teperberg recommended*83 Eisenberg to Cohen, and Eisenberg established with the bank checking accounts under the names of the various fictitious trade names. The signature cards signed by Eisenberg were of fictitious names and in each instance the business and address named was then, and at all times subsequent thereto, nonexistent, and fictitious. Eisenberg was the only person with authority to write checks on such accounts and was the only person who drew checks against the accounts. Petitioner did not maintain any accounts at the Modern Industrial Bank and he was not known to Cohen. The service was operated in the following manner. When a seller wished to use the services of Eisenberg and Teperberg, he would notify Eisenberg who would either write up an invoice for such sale on an invoice of one of the fictitious companies, or he or Teperberg would leave a blank invoice for the seller to fill out himself. The seller would then send such invoice to his customer. The check in payment for such merchandise, made out to the fictitious company listed on the invoice received by him, was either sent to the seller who then gave it to Eisenberg or Teperberg, or Teperberg would pick up the check from the buyer. *84 Eisenberg would then deposit such check in the proper account and, generally, would immediately write checks to cash equalling such amount and cash them. The cash thus obtained was brought by Eisenberg to the seller after deduction of one percent of the gross amount which amount was a commission divided equally between Eisenberg and Teperberg for their services. In order to avoid suspicion, Eisenberg would generally withdraw the amounts deposited in the accounts with several checks to cash in smaller amounts, generally ranging from $600 to $900. It was his policy not to write checks to cash in excess of $1,000. The period of time each of the five trade name accounts in issue were in use is as follows: AccountDate OpenedDate ClosedApex FabricsJan. 2, 1946Apr. 11, 1946Spartan FabricsJan. 22, 1946Mar. 7, 1946Velmar CompanyApr. 4, 1946May 17, 1946Velmar CompanyOct. 1, 1946June 26, 1947Venita CompanyMay 14, 1946July 22, 1946Venita CompanyOct. 25, 1946Sept. 22, 1947Sarona CompanyJune 25, 1946June 12, 1947No particular accounts were used for any particular seller using the service. Eisenberg and Teperberg used a room*85 at the Hotel Pennsylvania as an office from which they operated their billing service. During the years in issue petitioner used the services of Eisenberg and Teperberg for 27 sales totaling $30,532.36. (See Schedule C, infra.) All of these sales were made to two of petitioner's main customers, Beattie & McGuire, Boston, Massachusetts, and Miles Silk Shop, Louisville, Kentucky. All of the sales made by petitioner to Beattie & McGuire and Miles Silk Shop during the years 1946 and 1947 were transacted through the service, and all goods so sold were purchased by petitioner from one of his principal sources of supply, Samson, Polay & Goodman, Philadelphia, Pennsylvania, in the regular course of business. In addition to petitioner's main place of business, he rented storage facilities for his merchandise at the World Storage Company. Persons, in addition to petitioner, used the billing service to transact their sales during the period in issue. Among them was Abraham S. Hershenson, a textile jobber. Shortly after the opening of the various bank accounts with the Modern Industrial Bank, Eisenberg asked its assistant manager, Cohen, to recommend a stock broker. Cohen referred Eisenberg*86 to Phillip Schiffman who handled all stock transactions for the bank. On October 25, 1945, a brokerage cash account with Edward A. Viner & Co. was opened in the name of William Ainsberg, Hotel Pennsylvania, New York City, an alias used by Eisenberg. All stocks purchased under the brokerage account were mailed by special delivery or physically delivered to Eisenberg, and all stocks sold through this account were physically delivered by him to the broker. The stocks were registered in "street names." The employee of Edward A. Viner & Co. handling the account was Murry Schiffman, the son of Phillip Schiffman of the Modern Industrial Bank. Eisenberg personally delivered all payments toward the account to the brokerage house. Such payments were as follows: SCHEDULE ADateAmountOctober 29, 1945$ 1,827.00October 29, 19451,146.00October 30, 19451,929.78October 30, 19451,202.97November 23, 194510.00January 2, 19461,842.06January 2, 19461,992.44January 3, 19463,496.19January 3, 19463,082.62January 4, 19462,180.41January 4, 19461,829.53January 22, 19462,815.75January 29, 19461,253.09January 29, 1946850.50February 5, 19463,634.00March 7, 1946937.26March 7, 19462,000.00March 7, 19462,000.00June 18, 19463,753.28July 5, 194684.05September 11, 194611,277.95September 25, 1946256.33*87 All payments were made by check except for the payment of $84.05 on July 5, 1946, which was made by cash. The brokerage account was closed on May 8, 1947. Included in the numerous checks drawn by Eisenberg on the various bank accounts maintained by him were the following: SCHEDULE BDateAccountAmountJanuary 22, 1946Apex$2,815.75January 29, 1946Spartan850.50January 30, 1946Spartan1,253.09February 5, 1946Spartan3,634.00March 5, 1946Delta4,937.26The above checks include the only checks written on the five accounts in issue in excess of $1,000. Petitioner filed Federal income tax returns for the calendar years 1946 and 1947 based upon a cash receipts method of accounting with the collector of internal revenue for the third district of New York. Petitioner reported in Schedule C of his income tax return for 1946 total receipts from his business of jobber in piece goods and clothing materials the amount of $181,530.23, a net cost of goods sold of $152,089.54 (or 83.78 percent of gross receipts), and gross profit of $29,440.69. Petitioner reported in Schedule C of his income tax return for 1947 total receipts from his*88 business in the amount of $172,874.37, a net cost of goods sold in the amount of $150,821.23 (or 87.24 percent of gross receipts), and gross profit of $22,053.14. Petitioner had no inventory at the beginning or end of the aforesaid years and no other costs to be subtracted when computing his gross profits. The only business records maintained by petitioner during the years in issue were checkbooks, cancelled checks and bank statements of the business bank account maintained by petitioner under the name of General Fabrics Exchange. Petitioner's accountant prepared the returns for both years from these records. Such returns were consistent with the records maintained. Petitioner's records did not reflect any sales made by petitioner through the billing service. No sales other than those reflected in his records were disclosed to his accountant and no sales other than those made through his regular business were reported in income for the years in issue. Petitioner was indicted on March 6, 1953, for filing a false and fraudulent income tax return for the year 1946 with the intent to evade and defeat income tax in violation of section 145(b), I.R.C. 1939. On November 23, 1953, he*89 pleaded guilty to the charge in the United States District Court for the Southern District of New York. Hershenson, Eisenberg and Teperberg were also indicted in the District Court, Southern District of New York for conspiracy to evade Federal income taxes and for tax evasion for the year 1946, and were convicted on their pleas of guilty to evasion. During the years 1946 and 1947 the following amounts were deposited to the five bank accounts in issue: Name19461947Sarona$233,760.79Venita228,818.38Velmar219,719.53$15,563.66Apex95,638.49Spartan109,403.30Respondent's agents obtained copies of the deposit slips for all the bank accounts maintained by Eisenberg and Teperberg. By means of the clearing house numbers of the checks listed on such deposit slips, and subsequent tracing, they were able to identify the drawers of some of the checks deposited to these accounts. The agents then obtained from these companies copies of the invoices received by them under the various fictitious trade names and were able thereby to associate specific invoices with a specific deposit to the trade name accounts. These companies were also questioned concerning*90 the identity of the person from whom they had received the invoices. The following companies were discovered by respondent as having purchased merchandise through the billing service: Beattie & McGuire, Miles Silk Shop, Maternity Miracles, Jacob Shapiro, J. Brock & Co., Fred A. Block, Inc., and Cohen, Friedlander Martin Co.Respondent alleges that all the following sales made to Beattie & McGuire and Miles Silk Shop through the billing service during the years in issue were made by petitioner. SCHEDULE C1946Date ofBillDrawer of CheckSaronaVenita1-20-46Beattie & McGuire2-11-46Beattie & McGuire3-20-46Beattie & McGuire4-30-46Beattie & McGuire5-12-46Beattie & McGuire$1,512.166- 5-46Beattie & McGuire1,879.996-24-46Beattie & McGuire$ 1,203.967- 9-46Beattie & McGuire889.347-18-46Beattie & McGuire412.807-18-46Beattie & McGuire24.747-25-46Beattie & McGuire1,548.628- 8-46Beattie & McGuire903.609- 6-46Beattie & McGuire1,755.579-17-46Beattie & McGuire859.1010- 2-46Beattie & McGuire2,615.1211- 4-46Beattie & McGuire11- 8-46Beattie & McGuire1,793.5911-12-46Beattie & McGuire11-29-46Beattie & McGuire12- 2-46Beattie & McGuire1,061.72Miles Silk ShopMiles Silk ShopMiles Silk Shop5-16-46Miles Silk Shop909.118-16-46Miles Silk Shop1,101.8910- 8-46Miles Silk Shop714.48Total$14,884.53$4,301.2619472- 6-47Miles Silk Shop*91 SCHEDULE C1946Date ofBank AccountsBillVelmarApexSpartan1-20-46$1,244.772-11-46$ 504.583-20-461,608.204-30-46$2,935.915-12-466- 5-466-24-467- 9-467-18-467-18-467-25-468- 8-469- 6-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- 2-4611- 4-461,546.4511- 8-4611-12-46562.2611-29-46495.8112- 2-461,019.82129.23317.635-16-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- 8-46Total$5,540.43$3,579.46$1,244.7719472- 6-47$ 981.91Respondent also alleges that the sales made through the service traced to Maternity Miracles and Jacob Shapiro were made by Teperberg in his own behalf, and that the sales traced to the other three companies were made by Hershenson. In addition, respondent determined that a percentage of the other deposits to these five bank accounts in 1946 and 1947 (which he refers to as the "unidentified deposits") totaling $183,552.13 and $1,330.71, respectively, represent sales made by petitioner through the billing service which were also not reported in income. These figures were computed in the following manner: SCHEDULE DCOMPUTATION OF UNREPORTED SALES19461946SaronaVenitaVelmarApexCompanyCompanyCompanyFabrics1. Total deposits$233,760.79$228,818.38$219,719.53$95,638.492. Unidentified de-posits181,965.58175,234.97173,404.6892,012.223. Deposits identifiedto Schwartz14,909.29 *4,301.265,540.433,626.27 *4. Deposits identifiedto Hershenson4,699.6229,166.348,433.285. Deposits identifiedto Teperberg32,211.0620,115.8132,341.146. Total identifieddeposits51,795.2153,583.4146,314.853,626.277. Petitioner's per-centage of iden-tified deposits28.8%8.0%12.7%100%8. Petitioner's allo-cable share ofunidentified de-posits (lines2 X 7)52,381.3314,018.8022,022.3992,012.229. Unreported salesby petitioner(lines 3 + 8)67,290.6218,320.0627,562.8295,638.49*92 SCHEDULE DCOMPUTATION OF UNREPORTED SALES194619461947SpartanGrandVelmarFabricsTotalCompany1. Total deposits$109,403.30$887,340.49$15,563.662. Unidentified de-posits77,934.78700,552.2310,478.003. Deposits identifiedto Schwartz1,244.7729,622.02981.914. Deposits identifiedto Hershenson30,223.7572,522.995. Deposits identifiedto Teperberg84,668.012,820.486. Total identifieddeposits31,468.52186,788.265,085.66 **7. Petitioner's per-centage of iden-tified deposits4.0%12.7%8. Petitioner's allo-cable share ofunidentified de-posits (lines2 X 7)3,117.39183,552.131,330.719. Unreported salesby petitioner(lines 3 + 8)4,362.16213,174.152,312.62Respondent allowed the amount of $45,262.65 as cost of goods sold for the year 1946. No amount was allowed for cost of goods sold for the year 1947. Respondent's determination of unreported net income*93 may be summarized as follows: 19461947Deposits identified topetitioner$ 29,622.02$ 981.91Unidentified deposits at-tributable to petitioner183,552.131,330.71Total deposits$213,174.15$2,312.62Cost of goods sold45,262.65Net income$167,911.50$2,312.62Percentage of profits79%100%Petitioner transacted no sales through the billing service during the years in issue other than the 27 sales to Beattie & McGuire and Miles Silk Shop. The net profit realized by petitioner on these sales was $4,497.58 and $115.47 for the years 1946 and 1947, respectively. Such net income was not reported by petitioner during these years due to a fraudulent intent to evade and defeat tax. Opinion Understatements of Income Respondent determined that petitioner understated his net income from sales in the amounts of $167,911.50 and $2,312.62 for the years 1946 and 1947, respectively, and that such understatements were due to a fraudulent intent to evade tax. The basis for respondent's deficiency determinations is that petitioner transacted sales in the amounts of $213,174.15 and $2,312.62 through the Eisenberg-Teperberg billing service during*94 the years 1946 and 1947, respectively; that no part of such gross income was reported on petitioner's returns for these years; and that, after an allowance by respondent of $45,262.65 for cost of goods sold in 1946 (no amount being allowed for 1947), unreported net income from such sales amounted to $167,911.50 and $2,312.62 for 1946 and 1947, respectively. In determining a deficiency in income tax, the respondent's determination is presumed to be correct. The burden of proof is thus placed upon the petitioner to show that such determination is erroneous or invalid. Helvering v. Taylor, 293 U.S. 507 (1935). The parties agree that petitioner's returns for the years in issue properly reflect all sales transacted by petitioner under his own business name, General Fabrics Exchange, and the costs of such sales. They also agree, however, that any sales made by petitioner through the various fictitious trade names or the billing service were not reported on his business records or his income tax returns for 1946 and 1947. The only issues before us, then, are to determine the total amount of sales transacted by petitioner through the billing service during each of these years, *95 the net income realized on such sales, and whether some part of any deficiency for each of said years was due to fraud with intent to evade taxes. Petitioner concedes that the 27 identified deposits representing sales to Beattie & McGuire and Miles Silk Shop totaling $29,550.45 and $981.91 for 1946 and 1947, respectively, represent sales made by him through the service which were not reported in income. The only issue concerning the total amount of sales made by petitioner through the service, then, concerns the allocation by respondent of a portion of the unidentified deposits in each of the five accounts in question to petitioner. Petitioner has not maintained any records of the sales which he made through the billing service and thus has made the respondent's task of auditing his returns immeasurably more difficult than it should be. This conduct is not to be condoned. We are not, however, empowered to approve a deficiency determination merely because records have not been maintained. The absence of such records merely justifies the respondent in using some reasonable method of reconstructing petitioner's income, with the burden upon petitioner to show that respondent's method*96 is erroneous, unreasonable or arbitrary. Helvering v. Taylor, 293 U.S. 507 (1935), Maurice Cross, 24 B.T.A. 1079, 1081 (1931). In determining whether respondent's allocation method is reasonable and not arbitrary, we must consider any evidence in the record, either direct or circumstantial, showing that petitioner transacted any sales through the billing service to any companies other than Beattie & McGuire and Miles Silk Shop, or, in other words, whether petitioner transacted any sales in this manner other than those specifically identified to him by respondent. In these respects, we consider the testimony of Eisenberg and Teperberg, both of whom testified as witnesses for respondent. Eisenberg testified that he had known Teperberg personally prior to 1945; that Teperberg and his family had been engaged in the textile business; and that during 1945, Teperberg discussed with him the possibility of "coming in with him to learn the textile business." He further testified that he first was introduced to petitioner by Teperberg about this time and that at a meeting of the three men they discussed the problem of disposing of merchandise. In connection*97 with such meeting, he testified, he opened the several bank accounts in issue under names suggested by petitioner and that he signed the signature cards for each account with various fictitious names. Eisenberg testified that he was the only person authorized to withdraw funds from the accounts, and that his sole duties were to write up invoices for sales transacted through the service, to deposit checks from customers sold through the service, and to withdraw an equivalent amount of cash from the account at the same time. First, Eisenberg testified that petitioner was the only person interested in the accounts and the only person to whom he had given the proceeds of the checks which he deposited to them. When questioned further, he testified that Hershenson had also used the service and that he had given the proceeds of Hershenson's customers' checks to Hershenson, but that Hershenson and petitioner were the only persons to whom he had ever given the cash proceeds of the checks deposited. He also testified that he had received checks to deposit to the various bank accounts from Hershenson and Teperberg only; that Teperberg was acting as a salesman for petitioner for all sales*98 made in such manner by petitioner; and that Teperberg picked up the checks from petitioner's customers which he gave to Eisenberg to deposit. For his services, he testified that he received a one percent commission which he divided equally with Teperberg. Eisenberg, who admittedly handled all the checks deposited to the various trade accounts, testified that he was not able to recall the names of any of the customers to whom sales were made through the service. He testified that he was not even able to recall whether he was asked to name such customers at a 1950 meeting with internal revenue agents. When asked whether he, at that meeting, disclosed any names, he, however, was able to recall telling them that he couldn't possibly remember the names unless they were shown to him. While he admitted having received checks from the same customers many times, and that he was quite familiar with them in 1950, (only four years later) he testified that "there were so many names that I couldn't possibly remember any of the names." Finally, after being led by respondent, Eisenberg testified that he recalled depositing checks from Beattie & McGuire and Miles Silk Shop. Respondent also*99 relies upon the testimony of Eisenberg to associate petitioner with some o6 the unidentified deposits in another manner. The record shows that some of the unidentified deposits were withdrawn with checks drawn to the exact amounts as some of the deposits made to a brokerage account with Viner & Co. maintained under the name of William Ainsberg, an alias often used by Eisenberg. Eisenberg testified that the brokerage account, while in his name, was maintained solely for petitioner's benefit, and that he received all amounts to be deposited to such account from petitioner or from Teperberg who told him it originated with petitioner. When questioned further, however, as to whether he could recall ever receiving cash directly from petitioner for the brokerage account, he testified: "As far as I can recall, I could say the possibility is that I did receive, but I wouldn't be able to remember specifically." Nor could he recall whether he ever drew any checks on the various bank accounts to pay toward the brokerage account or whether petitioner had ever instructed him to do so. Yet, only minutes before, he testified that all checks on the various accounts were drawn to cash and cashed at*100 the same time and the cash delivered to either Hershenson or petitioner. When questioned as to whom he had delivered the stocks received by him from the broker, he testified first that they were all delivered to petitioner. Then he testified that he delivered them to Teperberg, who, in turn, gave them to petitioner, sometimes in his presence. Still later, he testified that he delivered all stocks to either Teperberg or petitioner, depending upon who was available. For all of his work in connection with such brokerage account, Eisenberg testified that he received no compensation. Eisenberg also testified that he knew nothing about the stock market and that he was "so far removed from any knowledge of brokerage that it was very funny"; that it was Teperberg who handled all transactions through the account and that Teperberg knew a customer's man at the brokerage, Murry Schiffman. Irving Cohen, who was an assistant manager of the Modern Industrial Bank in 1946, however, testified that it was Eisenberg who asked him to recommend a broker and that he recommended Phillip Schiffman, who handled all stock transactions for the bank, and who was also the father of Murry Schiffman. This*101 testimony is contrary to that of Eisenberg who testified that he had nothing to do with the operation of the brokerage account. Also, while Eisenberg testified that he could not recall the names of any customers at the trial or even in 1950, only four years later, he was able at the trial to identify the names of two stocks purchased through the brokerage account. We find it also incredible that Eisenberg would have consented to use his name for a brokerage account and act as a deliveryman without receiving any compensation. After reviewing the entire testimony of Eisenberg concerning petitioner's relationship with the billing service and the brokerage account, which is replete with inconsistencies and evasions, we find him unworthy of belief. Nevertheless, it is pertinent to note that Eisenberg never directly testified that petitioner even suggested the operation of the billing service; that petitioner used the service for a great many sales or more than any other person; nor, indeed, did he ever testify that petitioner sold to any customers besides Beattie & McGuire and Miles Silk Shop. His most enlightening direct testimony, therefore, is that petitioner and Hershenson were*102 the only users of the billing service. Concerning this point, the parties agree, and the record supports them, that contrary to Eisenberg's testimony, Teperberg also used the billing service to transact sales for his own account. Indeed, in respondent's allegations concerning identified deposits, the highest percentage of such deposits were identified to Teperberg. (See Schedule D, supra.) Respondent, in addition, admits that there were still other users of the service besides petitioner, Teperberg and Hershenson. Concerning the brokerage account, Eisenberg could not specifically recall ever having received cash directly from petitioner, nor having received instructions from petitioner to draw a check directly to the broker on his behalf. Eisenberg's testimony that Teperberg told him that the cash which the latter gave to him originated with petitioner is pure hearsay. Also, his testimony that while he never gave any stocks to petitioner, but only to Teperberg, he sometimes witnessed the latter giving the stock to petitioner is subject to much doubt. It would appear unreasonable for Eisenberg to have given stock to Teperberg for petitioner if he was present to witness the transfer*103 from Teperberg to petitioner. Apart from Eisenberg's testimony, it is pertinent to note that while respondent maintains and the record shows that amounts withdrawn from the Delta Fabrics account were deposited to the brokerage account, respondent does not even contend, nor is there any evidence in the record, that such account was ever used for petitioner's sales. Teperberg also testified not that petitioner had suggested or initiated the billing service, nor that it was maintained primarily for his use, but only that petitioner suggested the various names to be used. He also testified that he was engaged as a salesman for petitioner in 1945 and 1946; that his sales on behalf of petitioner were "so excessive that it didn't require any other job," and that all such sales were transacted through the various bank accounts in issue with the help of Eisenberg. For all of this work, he testified that he received a commission of one percent of the sales, which he divided equally with Eisenberg. Teperberg, however, testified that he wasn't able to recall the amount of the commissions earned by him or the total amount of sales allegedly transacted by him for petitioner during 1945 or*104 1946. This witness, who presumably would have been in close contact with petitioner's customers had he sold to them, testified that the only customer he could recall selling to on behalf of petitioner through the service was Maternity Miracles. We find it extremely difficult to believe that, had Teperberg been a full-time salesman for petitioner transacting an "excessive" amount of sales, he would be unable to recall the name of more than one customer sold to over a two-year period. Even when Teperberg was questioned by an internal revenue agent in 1953 concerning the customers to whom he had allegedly made sales on behalf of petitioner, he named only Beattie & McGuire, Miles Silk Shop and Maternity Miracles. At the same time, however, he was able to recall the names of deliverymen and suppliers of petitioner during 1946. Teperberg would certainly have had less contact with these men than with the customers with whom he had allegedly dealt. That Teperberg ever made sales to Beattie & McGuire on behalf of petitioner is highly doubtful in the light of the testimony of an employee of that company, a disinterested witness, that most of its purchases were made from petitioner personally. *105 We also think it incredible that, had Teperberg been a salesman for petitioner as he testified, he would have received only one-half percent commission for his services, the same amount received by Eisenberg whose sole function was to write up invoices and deposit and withdraw funds from several accounts. Petitioner testified that he never employed Teperberg to sell merchandise for him. An employee of Maternity Miracles testified that all purchases made by his firm through the various fictitious trade names were made from Teperberg as "the seller." Indeed, respondent himself alleges that it was Teperberg for his own account rather than petitioner who sold to Maternity Miracles through the billing service. While Teperberg testified that he was a salesman for petitioner during 1945, and that all of his sales went through the billing service, the first deposit to the various bank accounts in issue was made on January 2, 1946. Probably the greatest factor discrediting Teperberg's testimony that he was a salesman for petitioner is the testimony of Teperberg himself who, when questioned concerning the reason petitioner employed his and Eisenberg's service, testified: Because these*106 goods were without bills. He [petitioner] could not account for the sale of these goods; otherwise in what way would he use me and Mr. Ainsberg [Eisenberg] if he had bills for these goods? He bought goods on certain bills, and where he could account for it, he put it on his own billhead. But where he could not account for it, we were used. The above is not a statement from one who was a full-time salesman or employee of petitioner, but of one who, as petitioner testified, was used only when petitioner wanted a sale transacted through the billing service. At another point, Teperberg testified that petitioner paid cash for renting space in a warehouse. But, when later asked whether he knew if petitioner paid by check, he testified that he did not know. After a careful analysis of this witness' testimony, which is abundant with inconsistencies, evasions and contradictions, we conclude that he is unworthy of belief. Aside from this factor it is also pertinent to note that his only direct testimony concerning whether petitioner ever used the service for sales, other than those to Beattie & McGuire and Miles Silk Shop, was his testimony that he sold to Maternity Miracles on behalf*107 of petitioner. Concerning this point he is far from a disinterested witness, for respondent himself alleges that Teperberg made such sales on his own behalf and we believe the record supports such allegation. It is also pertinent to note that while Eisenberg testified that it was Teperberg who was petitioner's agent in transacting stock purchases, Teperberg did not testify concerning his association with the brokerage account. Petitioner testified that his only association with Eisenberg and Teperberg concerned the sales made to Beattie & McGuire and Miles Silk Shop for which he paid a one percent commission. His only reason for using their services for these sales, he testified, was that he was forced to receive the merchandise, which was the subject of these sales from Samson, Polay & Goodman on a cash basis without proper invoices. He also testified that he had never owned any stock during his lifetime. Petitioner's testimony concerning this point is partially corrobated by Charles Goodman, of Samson, Polay & Goodman, who reluctantly testified that his firm sold merchandise to petitioner on a cash basis during 1946. Even Teperberg testified that petitioner would use the service*108 only when he had received goods without invoices. Another factor in support of petitioner's testimony is that when he was first questioned by internal revenue agents concerning the various trade name accounts, he did not deny using them, but freely admitted such use and at that time he stated that the only customers to whom he sold in such manner were Beattie & McGuire and Miles Silk Shop. An agent for respondent also testified that the only invoices of the various trade companies located which were in petitioner's handwriting were those made out to these two companies. Based upon the record as a whole, with the above in particular, we conclude that the only sales made by petitioner through the billing service during the years in issue were the 27 sales to Beattie & McGuire and Miles Silk Shop. We, therefore, do not believe that there is any reasonable basis, from the record before us, from which to attribute any percentages of the unidentified deposits to petitioner. Assuming arguendo that the record disclosed some evidence of further sales by petitioner through the service, we still believe that the method employed by respondent to recreate them is arbitrary and unreasonable. *109 First, while such allocation is based upon the premise that only petitioner, Teperberg and Hershenson used the billing service during the two-year period in issue, respondent himself admits that there were other unidentified users of the service. Second, inasmuch as the record shows that there were no particular accounts used by a particular seller, or any pattern of use, there is no more of a reasonable basis to presume that petitioner made further sales through the five accounts in issue than there is to presume that he made other sales through the accounts not in issue. Third, the percentages obtained by respondent depend solely upon the extent of respondent's investigation and allegations of identified deposits. Had respondent concentrated upon finding only deposits belonging to petitioner, or failed to allege that some of the deposits were identified to other persons, the percentages attributable to petitioner under his method would have been substantially different. A glaring example of the unreasonableness of the method manifests itself especially in connection with the Apex Fabrics account. While there was no pattern in the use of the various accounts nor any evidence*110 or, indeed, any allegation that petitioner was the only person using such account, under this method, the entire amount of deposits to such account of $95,638 is attributed to petitioner because deposits to this account totaling $3,579.46, were identified to petitioner, and respondent contends that he was unable to identify any other deposits to this account. We conclude, therefore, that under the particular facts in this case, respondent's method of recreating sales allegedly made by petitioner lacks a reasonable basis and the minimal rational guarantees of reliability which are required of sanctioned methods. Respondent has attempted to discover petitioner's net worth for the years in issue and has found nothing incompatible with his income tax returns for these years. While we recognize the difficulty faced by respondent in this case in making an effective audit, we do not believe that the alternative lies in the effort to apply an unrealistic and arbitrary formula. Having found respondent's determination concerning the unidentified deposits to be erroneous, we conclude that the total amount of sales transacted by petitioner through the billing service was $29,550.45 and $981.91*111 for the years 1946 and 1947, respectively. Our next question concerns the total net income realized by petitioner on such sales. Respondent, in effect, determined that the net profit realized on such sales was 79 percent in 1946 and 100 percent for 1947. No explanation was made by respondent concerning the method used to arrive at such percentages in his deficiency determination nor on brief. Petitioner testified that the reason he did not report the 27 sales made by him through the billing service was that, unlike the reported sales made by him under his own business, these sales were made by him as a commission broker for Samson, Polay & Goodman, for a five percent commission; and that after paying a one percent commission to Eisenberg and Teperberg, and other "expenses," "there was nothing left, practically." Charles Goodman of Samson, Polay & Goodman, testified that petitioner had never sold merchandise for his firm as an agent or commission broker, and that his firm had only sold merchandise to petitioner for resale in the ordinary course of business. Petitioner's testimony concerning this point is a conglomeration of confusion, inconsistency and contradiction. While he*112 admitted that he was primarily a jobber who purchased merchandise for resale, he testified that he needed the merchandise sold by Samson, Polay & Goodman for his customers, but he refused to buy such merchandise because they demanded that all purchases be made on a cash basis. Because of such refusal, petitioner testified that he was forced to receive such merchandise to sell on a five percent commission basis. Petitioner, however, then testified that they "trusted" him, that he bought other merchandise for resale from them, sending them a check upon receipt of the goods, and that he even paid cash for the goods which he allegedly received on a commission basis, less a five percent commission. Why Samson, Polay & Goodman would demand cash for some sales and accept checks for others, and why petitioner would be willing to pay cash for the merchandise he allegedly received as a commission broker when the refusal to pay cash was allegedly the reason he refused to purchase the goods outright, is unexplained. When questioned why he was willing to make almost $30,000 of sales while recognizing little or no profit, petitioner first testified that such sales were made merely to "accommodate" *113 his two main customers, Beattie & McGuire and Miles Silk Shop. Petitioner also testified that these sales were the only sales made to these two customers during the years in issue. While we recognize that petitioner may have been willing to forego normal profits on an occasional sale to "accommodate" good customers, we cannot accept the view that petitioner would have been willing to voluntarily forego normal profits on all sales made to his two main customers during a two-year period. Petitioner then testified that he "didn't care about the profit" on these sales, and that, instead of returning the merchandise to the supplier, he figured he "might as well sell it in order to keep in good with the account" inasmuch as they were "a good source of supply." Petitioner here attempts to give the impression that he was stranded with unsalable merchandise, and that he unloaded it, sacrificing normal profits rather than return the merchandise and lose the good will of his supplier. Petitioner, however, testified that he would not even order any merchandise until after he had obtained a buyer. Petitioner, therefore, would not have sustained any risk and would have known that he had a buyer*114 and what his exact profit would be on each sale regardless of how he received the merchandise. Throughout his testimony, petitioner referred to the merchandise received from Samson, Polay & Goodman, which is the subject of the 27 sales in issue as the "memorandum" purchases, or merchandise received "on memorandum." In an effort to substantiate the fact that he received goods from Samson, Polay & Goodman as an agent or commission broker, he relies upon the fact that some of the invoices received from that company, which were received in evidence, had the words "On Memo" written across the bottom of them. In business usage, the term "on memo" on an invoice merely indicates that the buyer has the privilege of returning the billed merchandise if it is not sold. Webster's New International Dictionary, 2d Ed. (1954). The use of such term on the invoices, indeed, even indicates that petitioner did not receive such goods as an agent or broker, for in such event, there would be no need to grant petitioner this privilege. Petitioner has not explained the reason he used the billing service to transact the 27 sales in issue. We may only conclude, from all the circumstances, that he intended*115 to conceal such sales. Would petitioner seek to conceal sales upon which he realized "practically" no profit, and even pay a one percent commission for the privilege? We think not. We conclude, after reviewing petitioner's entire testimony concerning this point, that he is unworthy of belief and believe the testimony of Goodman insofar as he testified that petitioner never sold merchandise for his firm as a commission broker, but that he purchased goods from his firm as an independent jobber for resale. The percentages of profit realized by petitioner on the sales he made as an independent jobber through his regular business was 16.22 percent in 1946 and 12.76 in 1947. Respondent does not contend that such percentages are unreasonable or erroneous. We believe that it is reasonable to infer that petitioner, transacting the 27 sales in issue in the same markets as these other sales, realized the same percentages of profits as the reported sales. In any event, there is no acceptable evidence establishing a lower percentage. Accepting the percentages of net profits on the reported sales as evidence of the percentage of profits realized by petitioner on the unreported sales, and after*116 allowing for the one percent commission paid by petitioner to Eisenberg and Teperberg, we conclude that petitioner realized net profits on the unreported sales in the amounts of $4,497.58 and $115.47 for 1946 and 1947, respectively, which he failed to report as net income. Fraud We now consider the question whether or not a part of the deficiencies for the years 1946 and 1947 was due to fraud with intent to evade tax within the meaning of section 293(b) of the Code of 1939. The burden of proof with respect to fraud is, of course, upon the respondent and he must establish fraud on the part of the petitioner by clear and convincing evidence. Arlette Coat Co., Inc., 14 T.C. 751 (1950). It should be noted at the outset that our conclusion in this respect must be based upon consideration of the entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002, 1014 (1954). We also recognize that in this case, as in many fraud cases, the proof of fraud, if it is to be established, must depend in some aspects upon circumstantial evidence. Fraudulent intent can seldom be established*117 by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all of the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). After a painstaking analysis of all the evidence in this case and bearing in mind the above-stated principles, we are convinced that petitioner received taxable net income during the years 1946 and 1947 in the amounts of $4,497.58 and $115.47, in excess of that reported on his returns for those years, and that a part of such deficiencies or understatements was due to fraud with intent to evade tax. It is well established that respondent, in sustaining his burden of proof, need not prove the precise amount of the deficiency or underpayment attributable to such fraud, but only that a part of the deficiency or underpayment is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853. The record is replete with facts and circumstantial evidence which sustains the view that respondent has met his burden of establishing*118 that petitioner knowingly and intentionally failed to report income during the years 1946 and 1947 with the aim to evade taxes. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. The record does not expressly explain why petitioner went through such great lengths to conceal the sales in issue through the fictitious trade companies maintained by Eisenberg and Teperberg. We think it clear from the circumstantial evidence, however, that the aim was to conceal them from both the OPA and the taxing authorities. This inference is strengthened by the fact that petitioner maintained no records of the sales which he transacted through the billing service. Petitioner's accountant testified that in his preparation of petitioner's returns for these two years, no sales other than those reflected on petitioner's business records were disclosed to him by petitioner. While petitioner has not even so contended, we cannot believe that such failure was a mere oversight or due to negligence. Out of a total net income earned by petitioner in 1946 of $18,465.18, a total of $4,497.58 was not reported. This understatement of net income*119 was both substantial in amount and substantial in proportion to reported net income, such amounts being about 24 percent of total net income. This is also an indication that petitioner must have known, at the time he signed his returns, that his net income was greater than that reported, and that his failure to report such income was due to an intentional act to evade tax. While we recognize that the unreported net income in 1947 was trifling in amount and in proportion to reported income, this does not detract from the fact that the sale made in 1947 which was not reported was still part of petitioner's over-all method of concealing certain sales from the taxing authority. Persuasive indicia of fraud are also found in the fact that petitioner pleaded guilty in criminal proceedings involving the year 1946. No testimony or argument on brief was advanced to explain the circumstances surrounding such plea or to mitigate the inference normally to be drawn therefrom. Bennett E. Meyers, 21 T.C. 331, 348 (1953); Harry Gleis, 24 T.C. 941, 953 (1955), affd. per curiam 245 F. 2d 237 (C.A. 6, 1957); Leon Papineau, 28 T.C. 54, 58 (1957).*120 Petitioner, who was an experienced businessman, was "not a person who could fail to understand what the law requires of him under the circumstances." Louis Halle, 7 T.C. 245, 250 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949). Nor is there any element of bookkeeping errors involved here, or inefficiency or negligence in maintaining books and records. Gutterman Strauss Co., 2 B.T.A. 433 (1925), W. F. Shawver, 20 B.T.A. 723 (1930). Petitioner must have been fully aware that the total net income realized by him from the 27 sales made by him through the billing service was fully taxable and the size of the omission and petitioner's conduct convinces us that the omissions were not due to any mere oversight, but due to a conscious effort to conceal profits from the taxing authority in an effort to evade tax. We recognize that the foregoing is based to some extent upon inference and circumstantial evidence, but it is equally clear that circumstantial evidence, if clear and convincing, is sufficient in itself to establish a fraudulent understatement, especially when taken in connection with petitioner's failure to keep proper records. *121 Upon the basis of the foregoing, we hold that part of the deficiency for each of the years 1946 and 1947 was due to fraud with intent to evade taxes, and we, therefore, hold that the additions to tax under section 293(b) are to be applied, subject to recomputation under Rule 50 because of our determination reducing the net understatements of income. Upon the same facts as those on which we base our determination that some part of the deficiencies for the years 1946 and 1947 was due to fraud with intent to evade tax, we find that petitioner's returns for the years 1946 and 1947 were false and fraudulent with intent to evade tax within the meaning of section 276(a). Accordingly, the statute of limitations is not applicable to the deficiencies determined for these years. Additions to Tax Under Section 294(d)(2) Respondent has determined an addition to tax under section 294(d)(2) for substantial understatement of estimated tax for the year 1946. Petitioner, upon whom the burden of proof rests, has offered no evidence or argument on brief on this point. We have no occasion, therefore, to discuss the problem here except to state that the addition to tax under section 294(d)(2) for*122 this year will be redetermined in accordance with the deficiency in tax ultimately determined. William G. Lias, 24 T.C. 280, 322 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956). Decision will be entered under Rule 50. Footnotes1. The instant case presents problems similar in some respects to those involved in Abraham S. Hershenson v. Commissioner, Docket No. 81045, in which case Findings of Fact and Opinion are filed simultaneously herewith. The proceedings in the two cases have not been consolidated. What otherwise would appear to be inconsistent results stem from the material differences in the records of the respective cases as presented to us.↩*. The record does not reconcile the total with the total of the identified deposits on Schedule C. ↩**. The record does not disclose to whom deposits totaling $1,283.27 were identified by respondent.↩