Abraham S. Hershenson v. Commissioner.
Hershenson v. Commissioner
Docket No. 81045. [1]
United States Tax Court
T.C. Memo 1962-228; 1962 Tax Ct. Memo LEXIS 81; 21 T.C.M. (CCH) 1204; T.C.M. (RIA) 62228; September 26, 1962
*81 Petitioner, a textile jobber during the fiscal year ended July 31, 1946, transacted sales through fictitious companies in an effort to conceal violations of OPA regulations. Of the total net profits realized on such sales of $11,557.26, petitioner reported $3,250 on his return for that fiscal year. Held: That petitioner understated net taxable income on his return for the fiscal year ended July 31, 1946, in the amount of $8,307.26. Held, further, that a part of the deficiency for said year was due to fraud with intent to evade tax. Held, further, that an addition to tax under Sec. 294(d)(2), I.R.C. 1939, was properly imposed. Boris Kostelanetz, Esq., and Jules Ritholz, Esq., for the petitioner. Joseph M. Touhill, Esq., and Theodore E. Davis, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This proceeding involves deficiencies in income tax and additions to tax determined against petitioner as follows: Additions
to Tax, I.R.C. 1939
Fiscal
Sec.
Sec.
year ended
Deficiency
293(b)
294(d)(2)
July 31, 1946
$165,844.40
$82,922.20
$ 9,955.42
July 31, 1947
11,526.87
5,763.44
701.75
Total
$177,371.27
$88,685.64
$10,657.17
Respondent, on brief, has conceded the deficiency *82 determined against petitioner for the fiscal year ended July 31, 1947. The issues remaining for our consideration are: (a) Whether, and to what extent, petitioner omitted taxable income from his return for the fiscal year ended July 31, 1946; (b) whether any part of the deficiency is due to fraud with intent to evade tax; (c) whether the deficiency is barred by the statute of limitations; and (d) whether petitioner is liable for additions to tax under section 294(d)(2) for substantial underestimation of the estimated tax for the year in question. Findings of Fact Petitioner filed a Federal income tax return for the taxable year ended July 31, 1946, based upon a cash receipts method of accounting, with the collector of internal revenue for the second district of New York. Petitioner filed a Federal income tax return for the taxable year ended July 31, 1947, based upon a cash receipts method of accounting, with the collector of internal revenue for the sixth district of California.
From approximately 1934 until midsummer 1945, Abraham S. Hershenson, hereinafter referred to as petitioner, was in the retail textile business in his store at 97 Hester Street, New York City, under the name *83 of A. S. Hershenson. Petitioner maintained books and business records during the time he was in such business, and has retained the same certified public accountant, Sidney Ginsburg, throughout his business in New York. During the summer of 1945, petitioner sold his textile business and he and his wife went to California to examine the possibility of removing the family and commencing business there. Such move was contemplated and eventually made with the hope of improving the health of petitioner's wife and son. Petitioner's wife suffered from a rheumatic heart condition and his son was born a Mongoloid. His son had to be cared for as an invalid with constant personal supervision. At all times, petitioner's son lived in petitioner's household. Soon after petitioner and his wife returned from California the pregnancy of his wife was determined and her doctor advised against any move to California until after the baby was born. To sustain himself until after the birth of his child, petitioner, toward the latter part of 1945, rented a small amount of floor space in a store owned by Morris Wiederlight and Son at 215 West 39th Street, New York City. There petitioner carried on the business *84 of a jobber of textiles during the remainder of 1945 and through July 31, 1946. As a jobber, petitioner sold textiles, woolens and rayons in piece lots at wholesale to manufacturers of various garments. These sales were made on a face-to-face basis in the garment area in and around West 39th Street. When petitioner had found a customer, he would attempt to find a supplier for the desired quality and amount of the textile in question. At no time during his activities on West 39th Street did petitioner maintain an inventory. From September 1945 until the birth of petitioner's daughter on March 19, 1946, petitioner's wife was confined to her bed in a two-story house. A nurse was employed by petitioner from November 29, 1945, to May 18, 1946. The OPA regulations of ceiling prices on garments were maintained throughout this period until June 30, 1946, at which time such regulations were lifted. On July 25, 1946, the OPA ceiling prices were reinstated at their June 30th levels. Under the OPA ceiling price regulations, a jobber, such as petitioner, who had not established sources of supply prior to the Second World War, sometimes found it difficult or impossible to obtain yardage at or below *85 wholesale ceiling prices. As a result of the effect of OPA ceiling price regulations, there were available piece lots of materials on which all the margin of wholesalers' profits allowed by the OPA had already been taken. These materials could not be obtained with a bill of sale or invoice from the actual supplier on which a subsequent higher resale invoice could be based because all subsequent sales and, hence, the chain of invoices, would show a violation of the OPA regulations. During the latter part of the year 1945, Louis Schwartz, a textile wholesaler, with the help of Benjamin Teperberg, a salesman and William B. Eisenberg, a bookkeeper, caused to be established an elaborate system through which sales made in violation of OPA regulations might be concealed. (This system will hereinafter be referred to as the service.) Eisenberg obtained the registration of the trade names of various fictitious, nonexisting companies, and opened checking accounts for each of these companies. During the fiscal year ended July 31, 1946, the following trade names were used for the service: Delta Fabrics, Venita Company, Velmar Company, Sarona Company, Spartan Fabrics, Apex Fabrics, Relco Fabrics *86 and Simco (or Simro) Fabrics. The first trade name used was that of Relco Fabrics, the bank account for such company being opened on September 25, 1945. The service was originally operated as follows. When Schwartz, or any other person using the service made a sale, the purchasers were sent an invoice of one of the spurious trade name companies. The check of the purchaser drawn to the order of such trade name in payment for such sale was then taken by Eisenberg who deposited it in the account of the spurious trade name to which the check had been payable. Eisenberg then immediately withdrew the amount of the deposited check by checks made payable to cash. The cash thus obtained was taken by Eisenberg to the seller after deduction of two percent of the gross amount, which percentage represented the fees of Eisenberg and Teperberg for their services in connection with the spurious trade name transactions. A few months after the service originated, around January 1946, petitioner met Teperberg, and after petitioner told him of the difficulty he was having because of the OPA restrictions, Teperberg offered petitioner the use of the service to conceal illegal sales for a two percent commission. *87 Petitioner, interested in the service, went with Teperberg to meet Eisenberg. There an agreement was entered into whereby petitioner could call Eisenberg if he needed the services of Eisenberg and Teperberg. Neither petitioner nor Schwartz knew of each other's connection with the service, and they had never met during the time in issue. Petitioner had no connection with the actual operation of the service, the printing of the invoices, or the payment of any rent for the hotel room maintained to house the operations of the service. On various occasions when petitioner wanted to use the service, he would call Eisenberg who would go to petitioner's place of business at 215 West 39th Street in New York City. Petitioner there described to Eisenberg a sale or sales of goods which petitioner had made or was about to make to his customers which price exceeded the OPA ceiling, and Eisenberg wrote the information, the goods sold, the quantity, and the prices directly on a bill or invoice bearing the letterhead and name of one of the fictitious companies. Eisenberg then left the invoice with petitioner who either mailed the invoice to his customer or included the invoice with his shipment of *88 the merchandise sold to his customer. When petitioner received from his customers a check made payable to one of the fictitious companies in payment of a sale, he gave such check to Eisenberg, who then deposited such check in the appropriate bank accounts of the payee companies. At the time of making such deposit, Eisenberg withdrew an amount in cash equal to the amount of such deposit by presenting for payment checks made out to "cash" drawn on the fictitious company account. Immediately after completing such banking transaction Eisenberg returned to petitioner the total amount less two percent, which Eisenberg shared equally with Teperberg as a commission. Petitioner then used the cash retained after payment of the commission to pay his suppliers in cash for the materials supplied, retaining for himself the amounts remaining. To avoid detection, Eisenberg, would only use a trade name for a limited length of time, close the account and establish a new account. During the fiscal year ended July 31, 1946, petitioner, Teperberg, Schwartz and other unknown sellers, used the service to conceal sales made by them. Eisenberg did not use any particular bank account for any one person using *89 the service. On April 4, 1946, petitioner disconnected his business telephone and shortly thereafter went to California to look for a home and business and returned to New York City and his office on West 39th Street sometime in May 1946. After selling his home in New York, petitioner and his family moved to California at the end of September 1946. During the fiscal year ended July 31, 1946, petitioner maintained two bank accounts, one located at the Manufacturers Trust Company, primarily for his textile business, and one located at the Public National Bank and Trust Company primarily for his personal use. Deposits from other income sources such as rents and interests were also made in the latter account. The Manufacturers Trust Company business account between August 28, 1945, and November 3, 1946, reflects the following checks which petitioner drew to his order: Date
Amount
September 11, 1945 $200
October 5, 1945
75
October 15, 1945
75
October 20, 1945
100
October 30, 1945
100
November 14, 1945
100
November 29, 1945
100
December 26, 1945
100
February 18, 1946
100
No checks were drawn payable to petitioner or to cash after February 18, 1946. Between January 1 and July 31, 1946, petitioner made the following *90 deposits in his Public National Bank account: Date
Amount
January 14, 1946
$ 149.64
February 15, 1946
149.85
March 13, 1946
207.47
April 24, 1946
24.22
April 25, 1946
3,175.00
May 29, 1946
75.00
June 24, 1946
206.25
July 1, 1946
145.00
July 19, 1946
$ 135.00
July 29, 1946
300.00
July 31, 1946
2,250.00 The deposits of $3,175, $75, and $2,250 were made up of accumulated net cash proceeds of some of the sales petitioner made through the service. The remainder of the deposits were primarily from rent receipts and bond interest. The only business records maintained by petitioner during the period in issue were checkbooks, cancelled checks, and bank statements. No record was maintained by petitioner of sales made by him through the service, nor were any proceeds of the concealed sales deposited in his business bank account. In preparing petitioner's Federal income tax return for the fiscal year in issue, petitioner gave his accountant the above records. The accountant calculated the total sales by adding all of the deposits to the business bank account, except for two deposits totaling $15,000 which were designated as "capital" on his work sheet. Such noncapital deposits totaled $91,247.96. To this total, upon *91 specific instructions from petitioner, the accountant added the deposits of $3,175 and $75 in the Public National account as representing additional sales. The total sales thus reported were $94,497.96. The cost of goods sold, which was deducted in the amount of $81,347.99, was arrived at by adding all of the cancelled checks made out to suppliers. No cost of goods sold through the service was included or deducted. Such costs were paid by petitioner with cash. Schwartz, Eisenberg and Teperberg were indicted in the District Court, Southern District of New York, for conspiracy to evade Federal income taxes and for tax evasion for the year 1946, and were convicted on their pleas of guilty to evasion. Petitioner was indicted on September 3, 1954, for filing a false and fraudulent income tax return for his taxable year ended July 31, 1946, with the intent to evade tax under section 145(b), I.R.C. 1939, and on August 5, 1955, he pleaded guilty in the United States District Court for the Southern District of New York. Petitioner's use of the service was occasioned by his desire to conceal sales which he made in violation of OPA laws. Petitioner used such service when the wholesale ceiling *92 price on goods he needed for resale had nearly or already been reached and the allowable wholesaler's profits on such goods was exhausted, since any subsequent resale at his level would be in violation of OPA laws. Petitioner, in 1946 and in prior years, sold merchandise to J. Brock & Co., Cleveland, Ohio; Fred A. Block, Inc., Chicago, Illinois; and Cohen, Friedlander, Martin Co., Toledo, Ohio. The total deposits to the five fictitious trade name bank accounts in issue during the fiscal year ended July 31, 1946, is as follows: Company
Amount
Sarona Company
$ 53,942.71
Venita Company
180,418.93
Velmar Company
88,698.65
Spartan Fabrics
109,403.30
Delta Fabrics
110,056.91
Total deposits
$542,520.50
Forty-two of the deposits made to the above bank accounts during the fiscal year ended July 31, 1946, represented sales made by a seller using the service to J. Brock & Co., Fred A. Block, Inc. and Cohen, Friedlander, Martin Co. Respondent determined that all of these sales were made by petitioner and not reported in income. The dates of these sales and the companies through which they were made are as follows: SCHEDULE A
BANK ACCOUNTS
Date
Delta
Spartan
1946
Customer
Sarona
Venita
Velmar
Fabrics
Fabrics
7-15
J. Brock & Co., Cleveland, Ohio
$4,699.62
4-2
J. Brock & Co., Cleveland, Ohio
$2,937.13
4-4
J. Brock & Co., Cleveland, Ohio
560.21
4-9
J. Brock & Co., Cleveland, Ohio
958.50
6-4
Fred A. Block
$ 3,815.43
6-3
Fred A. Block
4,302.37
6-7
Fred A. Block
1,155.00
4-8
Fred A. Block
749.38
2-25
Fred A. Block
$ 2,472.43
Cohen, Friedlander Martin Co.,
Toledo, Ohio
$ 1,384.69 *
Cohen, Friedlander Martin Co., Toledo, Ohio
2,347.20 *
Cohen, Friedlander Martin Co., Toledo, Ohio
5,087.51 *
Cohen, Friedlander Martin Co., Toledo, Ohio
6,236.34 *
Cohen, Friedlander Martin Co., Toledo, Ohio
3,231.15 *
4-1
Cohen, Friedlander Martin Co., Toledo, Ohio
$3,228.06
1-18
Cohen, Friedlander Martin Co., Toledo, Ohio
$ 5,136.54
1-20
Cohen, Friedlander Martin Co., Toledo, Ohio
6,517.35
1-20
Cohen, Friedlander Martin Co., Toledo, Ohio
6,126.42
1-22
Cohen, Friedlander Martin Co., Toledo, Ohio
4,649.30
1-22
Cohen, Friedlander Martin Co., Toledo, Ohio
5,459.46
1-22
Cohen, Friedlander Martin Co., Toledo, Ohio
2,334.68
2-9
Cohen, Friedlander Martin Co., Toledo, Ohio
$ 3,568.56
2-11
Cohen, Friedlander Martin Co., Toledo, Ohio
5,261.50
2-8
Cohen, Friedlander Martin Co., Toledo, Ohio
4,706.98
2-7
Cohen, Friedlander Martin Co., Toledo, Ohio
5,883.32
2-14
Cohen, Friedlander Martin Co., Toledo, Ohio
4,956.35
2-15
Cohen, Friedlander Martin Co., Toledo, Ohio
1,996.37
2-15
Cohen, Friedlander Martin Co., Toledo, Ohio
3,737.33
2-21
Cohen, Friedlander Martin Co., Toledo, Ohio
6,974.90
2-25
Cohen, Friedlander Martin Co., Toledo, Ohio
5,219.74
2-27
Cohen, Friedlander Martin Co., Toledo, Ohio
6,032.20
2-26
Cohen, Friedlander Martin Co., Toledo, Ohio
3,403.88
3-1
Cohen, Friedlander Martin Co., Toledo, Ohio
6,849.84
3-2
Cohen, Friedlander Martin Co., Toledo, Ohio
6,536.16
3-2
Cohen, Friedlander Martin Co., Toledo, Ohio
2,443.53
3-7
Cohen, Friedlander Martin Co., Toledo, Ohio
3,948.68
3-6
Cohen, Friedlander Martin Co., Toledo, Ohio
4,535.08
3-18
Cohen, Friedlander Martin Co., Toledo, Ohio
2,024.53
3-26
Cohen, Friedlander Martin Co., Toledo, Ohio
2,565.55
3-29
Cohen, Friedlander Martin Co., Toledo, Ohio
2,918.68
2-21
Cohen, Friedlander Martin Co., Toledo, Ohio
5,800.71
Total
$4,699.62
$29,166.34
$8,433.28
$91,836.32
$30,223.75
*93 The total amount of the specific deposits which respondent contends represented unreported sales made by petitioner is, therefore, $144,465.77. In addition, respondent determined that $180,565.12 out of the total remaining deposits to the five accounts during the fiscal year in issue also represented unreported sales made by petitioner. For the fiscal year ended July 31, 1947, although no specific deposits in the five bank accounts were determined to belong to petitioner, of the total deposits to such accounts for that year of $374,802.07, respondent determined that $54,516.31 represented unreported sales of petitioner. Respondent's calculations of the determined unreported gross income from sales for both years are as follows: SCHEDULE B
COMPUTATION OF UNREPORTED SALES
FISCAL YEAR ENDED JULY 31, 1946
Sarona
Venita
Velmar
Spartan
Delta
Grand
Company
Company
Company
Fabrics
Fabrics
Total
Total Deposits
$ 53,942.71
$180,418.93
$ 88,698.65
$109,403.30
$110,056.91
$542,520.50
Unidentified Deposits
31,528.93
136,319.76
64,024.75
77,934.78
18,220.59
328,028.81
Total Identified Deposits
22,413.78
44,099.17
24,673.90
31,468.52
91,836.32
214,491.69
Identified Deposits for Peti-
tioner
4,699.62
24,166.34 **
8,433.28
30,223.75
91,836.32
164,359.31
Petitioner's Percentage of Iden-
tified Deposits *
9.1%
54.4%
16.4%
96.0%
100%
Petitioner's Allocable Share of
Unidentified Deposits (Line 2
times Line 5)
$ 2,869.13
$ 74,157.95
$ 10,500.06
$ 74,817.39
$ 18,220.59
$180,565.12
Unreported Sales by Petitioner
(Line 4 + Line 6)
7,568.75
103,324.29
18,933.34
105,041.14
110,056.91
344,924.43
FISCAL YEAR ENDED JULY 31, 1947
Total Deposits
$179,818.08
$ 48,399.45
$146,584.54
$374,802.07
Unidentified Deposits
150,436.55
38,915.21
119,857.93
309,209.69
Total Identified Deposits
29,381.43
9,484.24
26,726.61
65,592.28
Identified Deposits for Peti-
tioner
Petitioner's Percentage of Iden-
tified Deposits *
9.1%
54.4%
16.4%
Petitioner's Allocable Share of
Unidentified Deposits (Line 2
times Line 5)
13,689.74
21,169.87
19,656.70
54,516.31
Unreported Sales by Petitioner
(Line 4 + Line 6)
13,689.74
21,169.87
19,656.70
54,516.31
*94 The check for the purchase made by J. Brock & Co., on July 15, 1946, through the Sarona Company was deposited in the Sarona bank account on July 29, 1946. For the fiscal year ended July 31, 1946, respondent determined unreported net income as follows: Unreported sales
$344,924.43
Less: Additional costs of goods sold
and allowed
138,363.20
Additional income
$206,561.23
For the fiscal year ended July 31, 1947, respondent determined unreported net income as follows: Unreported sales
$ 54,516.31
Less: Cost of goods sold allowed
(50%)
27,258.15
Additional income
$ 27,258.16
Petitioner, in his income tax return for the fiscal year ended July 31, 1946, understated net income from sales in the amount of $8,307.26. A part of this deficiency was due to fraud on the part of petitioner with intent to evade tax within the meaning of section 293(b), I.R.C. 1939. Opinion Understatements of Income Respondent determined that petitioner understated his *95 net income from sales in the amounts of $206,561.23 and $27,258.16 for the fiscal years ended July 31, 1946, and 1947, respectively. Respondent, on brief, however, has conceded the deficiency determined for the fiscal year ended July 31, 1947. The basis for respondent's deficiency determination for the fiscal year ended July 31, 1946, is that petitioner made sales in the amount of $344,924.43 through the Eisenberg-Teperberg service during that fiscal year; that no part of such income was reported on petitioner's return for that fiscal year; and that after an allowance of $138,363.20 for cost of goods sold, unreported net income from such sales amounted to $206,561.23. In determining a deficiency in income tax, the respondent's determination is presumed to be correct. The burden of proof is thus placed upon the petitioner to show that such determination is erroneous or invalid. Helvering v. Taylor, 293 U.S. 507 (1935). In petitioner's return for the fiscal year ended July 31, 1946, he reported gross income from sales in the amount of $94,497.96 and cost of goods sold in the amount of $81,347.99. Respondent has not determined, nor has he contended on brief, that such costs were erroneous. *96 Nor has respondent determined or contended that any sales made by petitioner under his own name were not reported in income. The only issues before us with respect to the deficiency determination concern the sales made by petitioner through the service during the fiscal year ended July 31, 1946, and the cost of such sales. Since the taxpayer did not maintain adequate records from which his income from the sales made through the service could be checked and determined, the respondent was obliged to resort to other methods to determine such income. Through such methods, to be discussed, infra, he determined that the total sales made by petitioner through the service during the year in issue was $344,924.43. The parties agree that all of the deposits to the five trade name bank accounts in issue represent gross amounts of some of the sales made through the service. While the service maintained at least eight bank accounts, respondent has determined that deposits in only five accounts represent sales made by petitioner. Respondent alleges that 42 specific deposits to these five accounts totaling $164,359.31 represent sales made by petitioner. These deposits are what respondent refers to *97 as "identified" deposits. On brief, respondent has reduced this number to 36 deposits totaling $144,465.77, thereby conceding the six undated sales to Cohen, Friedlander, Martin Co. (See Schedule A, supra.) Respondent has introduced into evidence the bank statements of the five fictitious companies in issue which show these 36 deposits. He has also introduced into evidence the 36 invoices under the names of the five fictitious companies which amounts correspond to the 36 deposits reflected in the respective bank accounts. Respondent maintains that all of these invoices represent sales made by petitioner, and that the corresponding deposits totaling $144,465.77 in the five bank accounts in issue represented gross receipts on sales received by petitioner through the service. All of the 36 invoices, written by Eisenberg, show sales made through the five companies in issue to J. Brock & Co., Fred A. Block, Inc., and Cohen, Friedlander, Martin Co., between January 18 and July 15, 1946. Petitioner testified that he first began using the service about the end of February or the beginning of March 1946. He also testified that Eisenberg wrote the invoices for the sales which he made, that *98 he sold the same type of merchandise as that indicated on the 36 invoices, and that he sold merchandise to the three companies named on the "identified" invoices. Indeed, when confronted at the trial with many of the identified invoices, he did not deny any connection with them and even admitted the possibility that some may have represented his sales. Petitioner testified that he maintained no records of the sales which he made through the service, but that he only made about 12 sales. While he did not state the approximate amount of such sales, he testified that his net profit on such sales amounted to between $3,000 and $5,000, and that all of such net profits were deposited in his Manufacturers Trust business bank account. At the time of this testimony, petitioner was not able to locate or refer to his checkbook for this account. In a deposition taken after the trial, and after petitioner was able to refer to the checkbook for this account, petitioner testified that all of the deposits to such account were traced to checks for sales made under his own name. By some "process of elimination," however, he testified he was able to identify three deposits in his Public National personal *99 bank account as representing all of the accumulated net profits from his sales through the service. These three deposits were the ones on April 25, 1946, of $3,175; May 29, 1946, of $75; and July 31, 1946, of $2,250, totaling $5,500. Petitioner testified that the first two deposits were included in gross sales on his 1946 return and that he did not recall why the third deposit of $2,250 was not reported in income. Petitioner thus admits unreported income to the extent of $2,250. The accountant's work sheets show that the first two afore-mentioned deposits totaling $3,250 were included in the gross sales figure in calculating the total sales for petitioner's return, and we have found as a fact that such amount represented net proceeds from cash sales made through the service. Respondent does not contest this. While he, of course, accepts petitioner's admission concerning the unreported income of $2,250, he, nevertheless, contends that petitioner realized a greater profit from such sales than $5,500 which were not reported in income. This cannot be determined without first ascertaining the total amount of sales thus made and the cost of such sales. An employee of J. Brock & Co., Inc., *100 testified that he had no recollection of any business dealings with petitioner. Petitioner, nevertheless, has admitted that he made sales to the company in 1946. Fred A. Block of Fred A. Block, Inc., testified that the identified sale of April 8, 1946, in the amount of $749.38 through the Velmar Company was made by petitioners. He could not recall from whom he purchased merchandise on June 7, 1946, in the amount of $1,155 through the Venita Company. As for the purchases made by him on June 3 and 4, 1946, in the amounts of $4,302.37 and $3,815.43, respectively, through the Venita Company, Block testified that they were transacted in petitioner's place of business, but "it might have been a couple of other salesmen that waited on me." The purchase on February 25, 1946, in the amount of $2,472.43 through Delta Fabrics, the witness testified, was made in petitioner's place of business. The record shows that petitioner's "place of business" was a small section in a large textile store owned by another company, and that he did not have any salesmen working for him. Under the circumstances, it is clearly to be inferred that these sales were also made by petitioner. In 1952, in reply to a *101 letter from the Government concerning information as to the names of the individuals connected with the various fictitious trade names, Block stated that the only name that "came to his mind" was that of petitioner. No witness who was associated with Cohen, Friedlander, Martin Co. in 1946 testified at the trial. Petitioner, however, has admitted making sales to this company in 1946. Eisenberg testified on behalf of respondent. Except for matters concerning the procedure of operating the "service," his testimony, in most respects, agreed with that of petitioner. Eisenberg, however, testified that he personally wrote all of the 36 identified invoices upon instructions from petitioner and that he personally delivered the proceeds of these sales to petitioner from which he received his commission. Much has been written on brief by petitioner questioning the credibility of Eisenberg's testimony. This question has also concerned us because, inter alia, of Eisenberg's obvious antipathy toward petitioner, and because of inconsistencies in his testimony. Upon consideration of all the relevant circumstances, however, we are satisfied that, in his identification of the 36 invoices with petitioner, *102 his testimony is to be believed. The only method petitioner uses in his effort to rebut Eisenberg's identification of the 36 sales to petitioner concerns the time span during which he used the service. Obviously, no sales made before petitioner began using the service and no sales made after petitioner ceased using the service could be attributable to him. In addition, inasmuch as the parties agree that all invoices were written by Eisenberg after personal instructions from petitioner, no sales made during petitioner's absence from New York could be attributable to him. Petitioner could not recall the exact date he began using the service but testified it was approximately February or March of 1946. No other evidence was offered. Eisenberg on the other hand testified that petitioner began using the service "a few months" after the service began. While the record is not clear concerning this date, we know that it was in operation as early as September 25, 1945. Inasmuch as the first sale identified to petitioner was dated January 18, 1946, we cannot conclude that such identification was in error. Concerning the time petitioner stopped using the service, Eisenberg testified that he *103 could not recall exactly when this occurred, but that it was around the time the OPA regulations were suspended on June 30, 1946. Petitioner on the other hand testified that he stopped using the service on June 30, 1946. The only sale identified to petitioner dated after June 30, 1946, was a sale made on July 15, 1946, in the amount of $4,699.62 to J. Brock & Co. The check for this sale was deposited in the Sarona account on July 29, 1946. Petitioner testified that he made a deposit of $2,250 from proceeds of these sales on July 31, 1946. If petitioner ceased using the billing service on June 30, 1946, as he contends, we think it highly unlikely for him to have delayed depositing the $2,250 for almost a month. In addition, this sale was made to a company with which petitioner admittedly had done business. Under the circumstances, we see no reason to infer that Eisenberg's identification of this sale to petitioner was in error. The record discloses that petitioner left for California at the end of April and returned to New York sometime in May 1946. No sales dated between April 9, 1946, and June 3, 1946, however, were identified to petitioner. (See Schedule A, supra.) After a careful *104 examination of all of the testimony and evidence concerning the identified sales, we believe that all of such sales were made by petitioner through the billing service. Petitioner's sales through the billing service, therefore, totaled at least $144,465.77. In addition to the 36 specific deposits identified to petitioner, respondent determined that a percentage of the remaining deposits in each of the five bank accounts in issue made during the fiscal year ended July 31, 1946, represented sales made by petitioner. The total amount of deposits, and, therefore, gross sales, determined in this manner to be attributable to petitioner is $344,924.43. This amount was calculated in the following manner. Respondent first alleged that a small percentage of the specific deposits to the five accounts made during the fiscal years ended July 31, 1946, and July 31, 1947, represented sales made by either petitioner, Teperberg or Schwartz. No specific deposits to the accounts during the fiscal year ended July 31, 1947, however, were identified to petitioner. The remaining deposits respondent refers to as the "unidentified" deposits. Respondent, under the assumption that petitioner used the billing *105 service for both fiscal years, (although no deposits during the fiscal year 1947 were identified to him) determined that a certain percentage of each account's unidentified deposits for both fiscal years represented sales made by petitioner. To calculate these percentages for each separate account respondent used the deposits identified to petitioner as the numerator and the total deposits identified to all three men for both fiscal years as the denominator. The percentages thus arrived at for each separate account were applied to the unidentified deposits in each account for both fiscal years, with the resulting figures being attributable to petitioner. (See Schedule B, supra.) Petitioner has not maintained any records of the sales which he made through the service and thus has made the respondent's task of auditing his return immeasurably more difficult than it should be. This conduct is not to be condoned. Nevertheless, we are not empowered to approve a deficiency determination merely because records have not been maintained by taxpayers. The absence of such records merely justifies the respondent in using some reasonable method of reconstructing petitioner's income. The allocation *106 theory necessarily assumes that petitioner transacted sales through the five bank accounts in issue other than those 36 sales identified to him. The burden of proving that no additional sales were made is, of course, upon petitioner. No doubt, because of petitioner's failure to keep proper records, this burden may be difficult or impossible to sustain. This, of course, does not mitigate the burden placed on a taxpayer. In situations of this type, however, we must carefully scrutinize the method used by respondent to determine whether it contains the minimum rational guarantee of reliability which is required of sanctioned allocation methods. If the inference drawn and the determination made by respondent lacks this rational connection, and is unreasonable or arbitrary, such method and the deficiency arising therefrom cannot be sustained. Helvering v. Taylor, 293 U.S. 507 (1935); Maurice Cross, 24 B.T.A. 1079, 1081 (1931). What we have before us is the question of determining whether, under the particular circumstances of this case, the evidence considered as a whole, is of such character as to show that respondent's method of attributing additional income to petitioner was arbitrary *107 and unreasonable. In determining whether the allocation theory is unreasonable or arbitrary, two questions arise. First, whether it is unreasonable to attribute any percentage of the unidentified deposits in the five bank accounts to petitioner, and second, if it is not, whether the percentages, determined by respondent, are arbitrary or unreasonable and have no factual basis. Petitioner denies transacting more than 12 sales through the service and therefore, in effect, denies any connection with the unidentified deposits. While we may have been aided on this point by Eisenberg's memory, the witness was never asked by counsel concerning the approximate total number of sales made by petitioner nor, indeed, whether petitioner made any sales in addition to those specifically identified to him. From the lengthy record before us we know that the service was established primarily for the benefit of Schwartz; that at least eight different companies and bank accounts were used for this service; that petitioner maintained a business under his own name through which he transacted approximately $50,000 in sales during the six-months period in issue; and that petitioner made 36 sales through *108 the service, his transactions going through five companies; that no particular accounts were used by any particular seller; and that at least petitioner, Schwartz and Teperberg used the service. Based upon these facts we must determine whether it is unreasonable to conclude that petitioner made sales through the service in addition to the 36 identified sales. We believe that it would be unreasonable to conclude that petitioner made additional sales merely because of the large volume of sales transacted through the service. The service was maintained primarily for Schwartz who transacted all of his textile business through the service. Eisenberg testified that Schwartz's volume of sales was "tremendous." Petitioner, on the other hand, during the entire period in issue continued to transact business under his own name and had sales of approximately $50,000 during the period from January 1 through July 31, 1946. Petitioner did not use the service for all of his business but only when he wanted to conceal a sale made in violation of OPA regulations. The record shows that the service was not a joint venture between petitioner, Teperberg and Schwartz, from which we could infer some proportionate *109 share of the business allocable to each. Indeed, Schwartz did not even know of petitioner's use of the service nor did he know petitioner during the period in issue. Petitioner's use of the service was based solely upon Eisenberg's and Teperberg's desire to enlarge their commission income. To what extent this desire was satisfied in the form of allowing others to use the service is not clear. Eisenberg testified that petitioner, Schwartz and Teperberg were the only persons using the service. Petitioner, however, testified that Teperberg told him that "others" were also using the service. In addition, during a grand jury proceeding, Teperberg, when questioned whether petitioner knew that Eisenberg and Teperberg "had been doing the same thing for others," answered "That is correct; he knew that." Under all the circumstances, we conclude that it was unreasonable to attribute to petitioner any percentage of the unidentified deposits in the five bank accounts used by the service. Assuming arguendo that there is some reasonable basis to assume that petitioner made sales other than those identified to him, we believe that the percentages of the "unidentified" deposits determined by respondent *110 to belong to petitioner are unreasonable and arbitrary. Respondent determined the percentages for each account by calculating the percentage which petitioner's "identified" deposits for the fiscal year ended July 31, 1946, bore to the total of all "identified" deposits for the fiscal years July 31, 1946, and July 31, 1947. The record indicates that petitioner had no connection with the billing service for the fiscal year 1947. Respondent, we believe, correctly conceded any deficiency determined for the fiscal year 1947. The use of the identified deposits for the fiscal year 1947 in the percentage calculation, therefore, has no application here and produces completely arbitrary percentages from which additional income for 1946 should not be determined. While we recognize that the incorporation of such deposits in the calculation causes the percentages of petitioner's identified deposits to be lower than had respondent only used the identified deposits for the fiscal year 1946, it is no answer that such percentages, because they are less, must be taken as reasonable. Respondent's determination, although lover than he could have made it with further extension of his conjecture, must still *111 be based on a reasonable foundation. In respondent's allocation method he assumes that the identified deposits in fact belonged only to petitioner, Schwartz and Teperberg, and that the unidentified deposits belong to these men in the same proportion as the identified ones. As we stated above, the evidence indicates that there were other users of the service, and we find it unreasonable to infer that all of the unidentified deposits belonged only to petitioner, Schwartz and Teperberg. In addition, we believe it is unreasonable, under the particular facts in this case, to assume that the unidentified deposits belonged to the three men in the same proportion as the identified deposits. The unreasonable results arising from respondent's method can be seen from the fact that petitioner would be charged with over half of the deposits in three of the accounts when the evidence establishes that all of the accounts were used primarily for Schwartz's benefit and that petitioner did not use the service for all of his sales. We note, also, that under this method, petitioner is charged with 100 percent of the deposits in the Delta account, while Eisenberg testified that he made deposits in this *112 account for Schwartz. The method, among its other imperfections, does not take into consideration the fact petitioner was away from New York for about one-sixth of the time in issue and did not make any sales during this period. We believe, under the particular facts in this case, respondent's method of projecting sales based upon alleged identified sales lacks the minimum rational guarantees of reliability which are required of sanctioned allocation methods. While we recognize the difficulty faced by respondent in this case in making an effective total audit, we do not think the solution lies in the effort to apply an unrealistic and arbitrary formula. Other techniques, such as the determination of income by net worth increase method, have been developed for situations of this type which have been quite effective in ferreting out unreported income where the usual auditing methods are inadequate. No such method has been availed of in the instant case. The determination of the respondent concerning the unidentified deposits having been shown to be in error, the presumption of correctness in respect thereto disappears. Ross Bowman, 17 T.C. 681, 688 (1951). We conclude, therefore, *113 that the petitioner's total sales through the service for the fiscal year ended July 31, 1946, totaled $144,465.77. Our next question concerns the total net income realized by petitioner on such sales. Respondent determined that petitioner's net profit on his sales through the service amounted to one-half of the gross sales. While no evidence was introduced by respondent concerning the percentage of profit, his determination appears to be based upon the fact that the sales were made in violation of OPA regulations and, therefore, the percentage of profit should be far greater than normal profits for the textile business. Petitioner testified that he did not maintain any inventory, and that he would first solicit sales and then seek out a supplier of such merchandise. Inasmuch as he did not have direct lines of supply from textile manufacturers, petitioner testified he was forced on many occasions to buy from textile wholesalers merchandise at prices which approached or exceeded the wholesaler's ceiling price. Since this wholesaler's ceiling price was also applicable to sales which he made, in order to make a profit, he sold above such ceiling price in violation of OPA regulations. *114 It was only for such sales, petitioner testified, when his cost of goods sold approximated his own allowed resale price that he used the service in order to conceal his sales. Petitioner testified that because of the fact that he had to pay near the ceiling prices, and that the buyers of such textiles in turn had a ceiling price on which they could resell merchandise, his profit was no greater than his sales made in conformity with OPA regulations, and that he made about eight percent profit on woolens and about 12 percent profit on linings and crepes. Petitioner's net profit on the legal sales made under his own name was about 11 percent. The fact that petitioner could not have sold at a price too far above the OPA ceiling price is corroborated by a disinterested textile merchant who testified that he knew that sales made in violation of OPA regulations in New York during the time in issue were only about three to five percent above the ceiling prices. Accepting petitioner's testimony that he only used the billing service when the price he paid for merchandise approached his resale ceiling price, that he made between 8 and 12 percent profit on these sales, and accepting the merchant's *115 testimony that three to five percent above ceiling prices was all the market would bear, we conclude that petitioner's percentage of profit on sales made through the billing service was 10 percent. Based on total sales of $144,465.77, petitioner's profit would be $14,446.58. From these profits, petitioner paid a commission to Eisenberg and Teperberg of two percent of total sales, leaving net profit in the amount of $11,557.26. Petitioner included in his income tax return for the fiscal year ended July 31, 1946, net income from sales through the billing service in the amount of $3,250, thus leaving unreported net income from such sales in the amount of $8,307.26. Fraud We now consider the question of whether or not a part of the deficiency for the fiscal year ended July 31, 1946, was due to fraud with intent to evade tax within the meaning of section 293(b) of the Code of 1939. The burden of proof with respect to fraud is upon the respondent, and he must establish fraud on the part of petitioner by clear and convincing evidence. Arlette Coat Co., Inc., 14 T.C. 751 (1950). It should be noted at the outset that our conclusion in this respect must be based upon consideration of the *116 entire record properly before us, and that we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002, 1014 (1954). We also recognize that in this case, as in many fraud cases, the proof of fraud, if it is to be established, must often depend, in some respects, upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced, as any other fact, from all of the evidence of record and inferences properly to be drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). After a painstaking analysis of all of the evidence in this case and bearing in mind the above-stated principles, we are convinced that petitioner received taxable income during the fiscal year ended July 31, 1946, in an amount approximating $8,307.23 in excess of that reported on his return, and that a part of the deficiency resulting from such understatement was due to fraud with intent to evade taxes. It is well established that respondent, in sustaining his burden of proof, need not prove the precise amount of the deficiency *117 or underpayment attributable to such fraud, but only that a part of the deficiency or underpayment is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853. The record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that some part of the deficiency for the fiscal year in question was due to fraud with intent to evade taxes. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. During the year in issue, petitioner made many sales in cash transactions which he failed to record in any books or records. Indeed, petitioner even failed to inform his accountant of such sales. Petitioner concedes that he failed to report a total of $2,250 of net income from these cash sales and has offered no acceptable explanation for such failure. Petitioner's accountant testified that he calculated petitioner's income for the year in issue from the bank statements, cancelled checks, and check stubs from the business account. Of the deposits in the personal account he testified that petitioner only *118 instructed him to pick up the two deposits totaling $3,250 as sales income. No mention was made by petitioner to his account concerning the third deposit of $2,250 which petitioner testified was made up of net profits on the illegal sales. Petitioner has not even contended, and we cannot believe, that such failure was an oversight. Petitioner, after 15 years, was able to definitely identify this deposit as representing income from his cash sales. Especially because of the disproportionate amount of such deposit to the other deposits in the account, we would find it very difficult to believe that when petitioner reviewed the deposits to this account for purposes of instructing his accountant, he could overlook such deposit or fail to remember its source. The inference is compelling that such failure to include the $2,250 in income was an intentional act to evade tax. Persuasive indicia of fraud are also found in the fact that petitioner pleaded guilty in criminal proceedings involving the same matter and fiscal year. No testimony or argument on brief was even advanced to explain the circumstances surrounding such plea or mitigate the inference normally to explain the circumstances *119 surrounding such plea or mitigate the inference normally to be drawn therefrom. Bennett E. Meyers, 21 T.C. 331, 348 (1953); Harry Gleis, 24 T.C. 941, 953 (1955), affd. per curiam 245 F. 2d 237 (C.A. 6, 1957); Leon Papineau, 28 T.C. 54, 58 (1957). Petitioner, who was an experienced businessman (although with little formal education), was "not a person who could fail to understand what the law requires of him under the circumstances." Louis Halle, 7 T.C. 245, 250 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949). Nor is there any element of bookkeeping errors involved here, Gutterman Strauss Co., 2 B.T.A. 433 (1925), or inefficiency or negligence in maintaining books and records. W. F. Shawver Co., 20 B.T.A. 723 (1930). Petitioner must have been fully aware that the total net income realized by him from the illegal sales were taxable and we are satisfied that the omission was not due to any mere oversight, but due to a conscious effort to conceal profits from the taxing authority in an effort to evade tax. We recognize that the foregoing is based to some extent upon inference from circumstantial evidence, but it is equally clear that circumstantial evidence, if clear and convincing, *120 is sufficient of itself to establish a fraudulent understatement, especially when taken in connection with taxpayer's failure to keep proper records. Upon the basis of the foregoing, we hold that part of the deficiency for the fiscal year before us was due to fraud with intent to evade taxes, and we, therefore, hold that the addition to tax under section 293(b) is to be applied, subject to recomputation under Rule 50 because of our determination reducing unreported income for these years. Upon the same facts as those on which we base our determination that some part of the deficiency in this case was due to fraud with intent to evade tax, we find that petitioner's return for the fiscal year ended July 31, 1946, was false and fraudulent with intent to evade tax within the meaning of section 276(a), I.R.C. 1939. Accordingly, the statute of limitations is not applicable to the deficiency in issue. Addition to Tax Under Section 294(d)(2) Respondent has determined an addition to tax under section 294(d)(2) for substantial underestimation of estimated tax. Petitioner, upon whom the burden of proof rests, has offered no evidence or argument on this issue. We have no occasion, therefore, *121 to discuss the problem here except to state that any addition to tax under section 294(d)(2) will be redetermined in accordance with the deficiency as ultimately calculated. William G. Lias, 24 T.C. 280 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956). Decision will be entered under Rule 50. Footnotes
1. The instant case presents problems similar in some respects to those involved in Louis Schwartz v. Commissioner, Docket No. 81217, in which case Findings of Fact and Opinion are filed simultaneously herewith. The proceedings in the two cases have not been consolidated. What otherwise would appear to be inconsistent results stem from the material differences in the records of the respective cases as presented to us.↩
*. The respondent on brief no longer contends that such sales totaling $19,893.54 were made by petitioner.↩
**. Respondent has lowered the total identified deposit to this account to $9,272.80 but has not adjusted the figures which, under his method, would be affected thereby.↩
*. A ratio of petitioner's identified deposits to the total identified deposits for the two years. ↩