### UNITED STATES v. CHAPMAN.
### No. 9369.

Circuit Court of Appeals, Seventh Circuit.
June 18, 1948.

Rehearing Denied Aug. 4, 1948.

---

998

Henry W. Dieringer and Michael F. Mulcahy, both of Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., and Jack A. Welfeld and Lawrence J. Miller, Asst. U. S. Attys., all of Chicago, Ill., for appellee.

Before SPARKS and MINTON, Circuit Judges and DUFFY, District Judge.

SPARKS, Circuit Judge.

Appellant was convicted of attempting to evade payment of income tax alleged due for the year 1943, in violation of section 145(b) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 145(b). The principal errors urged on this appeal relate to the bill of particulars, the use of allegedly prejudicial testimony relating to appellant's receipt of moneys in addition to the regulation prices charged for the sale of meat by the corporation of which he was an officer and principal stockholder, and the use of an allegedly uncorroborated extra-judicial admission to prove one of the essential elements of the offense.

Appellant is the president and principal stockholder of the Empire Packing Corporation, engaged in the processing and sale of meat. The indictment charged him with attempting to evade a large part of his individual income tax by filing a fraudulent return showing gross income of $90,-124, instead of an actual gross income of $301,405, including an item of $282,115 listed in the indictment as "other income," and by concealing from the Collector the true gross and net income received by him during the year and the sources thereof.

Appellant asked for and the court allowed a bill of particulars as to the item of "other income." The Government thereupon filed a bill stating that it was

...ared to prove that appellant expended ...mount alleged in the indictment over ...ed income but that it did not possess ...nformation necessary to specify in de... the amount of every item making up ... aggregate of $282,115, or by whom ...h item making up this aggregate ...ount was paid to appellant, or the char...ter or manner of payment. Appellant ...en moved to dismiss on the ground that ...is admission on the part of the Govern...ent that it lacked knowledge as to the in...me alleged voided the indictment. Sub...equently, the Government was permitted ...o amend its bill of particulars to state ...that appellant expended during the year 1943 an amount in excess of the total of his available declared resources, and to file supplemental bill to the effect that the source of the "other income" was the illegal sale of meat at overceiling prices, the details of which transactions were matters peculiarly within the knowledge of appellant. The motion to dismiss was overruled, and the court denied a motion for a more specific bill of particulars.

We find no error in this action of the District Court. The bill of particulars as amended and supplemented sufficiently apprised appellant of the theory of the charge against him and of the general character of the evidence the Government expected to rely upon to sustain that charge. He was not entitled to more. United States v. Skidmore, 7 Cir., 123 F. 2d 604; United States v. Gorman, D.C., 62 F.Supp. 347. The granting or denying of a bill of particulars is, of course, a matter within the sound discretion of the court. We find here no abuse of that discretion.

In presenting its case, the Government undertook to show that appellant's private expenditures for the year 1943 greatly exceeded his available declared resources, and that he had sources of income for that year from which the additional funds could have been derived.

As a starting point in ascertaining appellant's net worth, the Government established by his books and records that his total assets as of January 1, 1942, amounted to $246,668. Appellant himself corroborated this. According to the testimony of Revenue Agent Loyd who conducted the examination of the books, he stated that, except for a few dollars in his pocket, he had no other cash on hand and no currency in any safety deposit box, and that the work papers prepared by the agents showing assets and liabilities as of January 1, 1942, were substantially correct. The agent added to the amount of appellant's net worth as of January 1, 1942, the total of income reported for the year 1942 and, with adjustments for certain items, ascertained his net worth as of January 1, 1943, to be $282,227. As of December 31, 1943, the evidence indicated a net worth of $533,-538, or an increase for that taxable year of $251,310 which, together with $51,304 of nondeductible expenditures and property transfers, resulted in a taxable income of $302,614.

The evidence as to the increase in the net worth during the year 1943 consisted largely in proofs of currency expenditures during that year in amounts greatly in excess of the $90,131 income reported by appellant for the year 1943, and of all his declared available resources. The largest single expenditure was of $100,000, paid in two installments for the purchase of a farm, $45,000 in currency of small denominations up to $50 bills, the latter part of March, 1943, and the balance, $34,000 of which was in currency, shortly thereafter. This farm was carried on appellant's records at an original cost of $55,000 which appellant told Loyd, upon inquiry by Loyd as to the discrepancy in the figures, was all he paid. In addition, the evidence showed large expenditures on the farm including $73,546 for improvements, $128,925 for cattle and hogs, $33,559 for feed, and $10,821 for miscellaneous items.

Appellant also told Loyd that the $71,000 miscellaneous income reported in his 1943 return was from "commissions" which he also said constituted the source of the money paid for the farm and the large expenditures thereon. These commissions he explained to Loyd as "tips" paid to him for telling people where they could buy meat. However, he said he could not remember the names of any such persons, nor where he had sent them to procure the meat. When Loyd pointed out to him that their

investigations indicated that he had spent two or three hundred thousand dollars more than he had available according to his 1943 income tax return, and asked him to explain the difference, where the money had come from, he replied that he could not offer any explanation as to where it had come from.

In addition to the large currency expenditures by appellant, amounting to $283,-455, the record also showed that appellant used two bank accounts in the name of an agent, none of the transactions of which was entered in his own books and records. The total of deposits in these two accounts amounted to $91,971 for the year 1943, none of which was reflected in appellant's books. In addition, appellant also had an account in his own name in one bank, not shown in his books, and deposits in this account aggregated $85,499. Loyd testified that he questioned appellant about this latter account, and appellant denied having any such account. The Government construed this as evidence of appellant's concealment of his resources and transactions. The evidence showed a total of $151,909 expenditures of which there was no record whatever in appellant's books and records. As a further part of this pattern of concealment, the evidence showed that appellant had on record two mortgages aggregating $37,500 on properties owned by him which were in fact dummy mortgages, representing no indebtedness on the part of appellant. The evidence also showed that on several occasions he had his agent purchase cashier's checks for him from several different banks, aggregating $35,000, paying cash furnished by himself therefor.

To establish the fact of a possible source of the income indicated by appellant's huge expenditures, the Government introduced the evidence of seven meat peddlers all of whom testified that during the year 1943, they paid overceiling prices for meat purchased from the Empire Packing Company, paying the excess in currency either to Chapman direct, or to one of two salesmen both of whom testified that they received payments for the excess which they turned over to appellant who directed them not to keep any record of such payments. In each case, payment was made to Em-

pire for the regulation price. Only of the peddler witnesses testified exact amounts, and he stated that his payments started in April, 1943, and tinued through December of that y amounting to six or seven thousand dol in all, paid to the two salesmen who te fied that they collected overceiling pri for appellant. This evidence was not troduced to prove the amount of appellant's receipts from illegal sources,—in f. the Government made no attempt to pro the total of such receipts. It was only establish the possible source of the funds used for the expenditures which so sub stantially exceeded appellant's declared available resources.

Appellant contended that his admittedly large currency expenditures were made from accumulations of currency over a period of years, kept by him in safety deposit boxes. To establish this defense he introduced a witness, Hirsch, who testified that early in 1943 he accompanied appellant to a bank where the latter had a safety deposit box, and while there had occasion to observe the contents of his deposit box. He said that he saw a large amount of cash wrapped in bundles. His testimony regarding this was as follows:

"I said, 'Sam,'—I was rather shocked and I had mentioned this to him before; I said, 'You know the bank across the street burned down, and it seems you have at least $200,000, maybe $210,000 in cash, in here, get rid of it, do not keep it in one place, am I not right in the amount?'

"He said, 'I believe it is about $225,000. I recently counted it.'

\* \* \* \* \* \*

"I said, 'Sam, you should do something; I have talked to you about this before and after today I am just going to keep my mouth shut.'

"So he said, 'I will take out $50,000,' and he proceeded to count it out and put it in his pocket."

Appellant also introduced the evidence of an accountant Kulbarsh, who testified that from his examination of appellant's records, the testimony of witnesses, and the tax return for the year 1943, he determined that appellant had cash available

for the year 1943 in the amount of $460,-020. He also testified that from his examination of data for the years 1913 to 1942, obtained from appellant's income tax returns and information furnished by the Bureau of Internal Revenue, he ascertained that, after payment of federal income taxes, appellant retained cash in the amount of $368,186, through the years from 1913 to 1942. This total apparently represented the difference between appellant's income and the tax paid thereon for those years, as indicated by his tax returns or data based thereon. However, on cross examination, after deducting amounts expended for certain capital transactions, real estate purchases, and estimated personal living expenses for the period from 1913 to 1942, Kulbarsh estimated the available cash to be only $12,156. And eliminating the $225,000 item from the net worth estimate as of January 1, 1943, he computed the total net worth as $186,268, which was $230,518 less than his estimate of appellant's net worth as of December 31, 1943. In reply to an inquiry of Government counsel, he stated that, assuming that the excess of net worth on December 31, 1943, over that of January 1, 1943, was taxable income for 1943, there would be a tax due in excess of the amount indicated on appellant's tax return for that year.

To refute the evidence of the meat peddlers who testified that they had paid over-ceiling prices for their meat either to appellant or his agents, appellant introduced in evidence the affidavits of five of them to the effect that they had paid only the amounts invoiced by Empire, and had never paid Empire, appellant or any other employees any additional sums of money, gratuities, or other consideration for the meat purchased by them from Empire. The secretary of the Empire Company testified that he was a notary public; that he knew each of the affiants personally and had acknowledged the signature of each and that each had signed in his presence. He stated that he had acknowledged about sixty of the affidavits, and that he distinctly remembered in each instance that he had told the affiant to read the instrument, sign it, and swear to it. However, three of the peddlers who testified to the overceiling prices stated that there had been no notary public present when they signed; two of these said they had never read the affidavits before.

■ Appellant contends that inasmuch as the Government did not have evidence of his receipt of income from black market sales of meat in excess of the $71,000 miscellaneous income reported by him, it was highly prejudicial for it to introduce the evidence. The Government made no attempt to show the exact amounts of unreported income on which it charged the evasion of tax, Nor was it necessary that it should do so. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. This case was based on the unexplained and unreported increase in appellant's net worth during the year 1943 as indicated by vast expenditures far in excess of his declared available resources, in conjunction with proofs of a possible source of income as indicated by the evidence of the group of dealers who testified to paying him sums of money based on amounts of meat purchased by them from the corporation of which he was the president and principal stockholder. Government witness Loyd testified that appellant, who did not take the stand, told him that the $71,000 "miscellaneous income" reported on his 1943 return as well as the money with which he made his large currency expenditures, was derived from "commissions," which he explained as "tips" paid to him for telling people where they could buy meat. This was all substantial evidence to go to the jury on the question of a source of the income on which he was accused of evading the tax. Appellant was not entitled to have the evidence suppressed on the ground that it was derived from an illegal source. Cf. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

■ Appellant contends that, "In a 'net worth case,' the starting point must be based upon a solid foundation and a Revenue Agent's statement of the defendant's oral admission or confession when uncorroborated is not sufficient to convict." We fully agree with this statement of the law. However, we find no deviation from it in this case. The actual starting point here

was the net worth as established by appellant's books and records. From these Loyd drew up a statement of appellant's assets and liabilities as of January 1, and December 31, 1942. According to his testimony, he showed these to appellant on at least two occasions and asked him if he had any other assets or liabilities, and appellant replied that those were all he had, and, upon specific inquiry as to whether he had any currency, cash on hand, besides an item of $2,375 entered on his books, he replied that the records were substantially correct as to that, and he had no other cash with the exception of a little money in his pocket. We cannot agree with appellant's designation of this as an "uncorroborated admission." In the first place, we think the Government was entitled to expect that books furnished for examination into a taxpayer's fiscal affairs would be correct, and a verification of their accuracy can scarcely be called an "uncorroborated admission."

We find further corroboration of the Government's estimate of appellant's net worth for the years in question in the evidence of appellant's own accountant, Kulbarsh. He testified that he examined data derived from appellant's tax records from 1913 to 1942. He found that during that twenty-nine year period, appellant had income over and above federal income taxes amounting to $368,186, or, as we compute it, an average of twelve or thirteen thousand dollars a year. He stated that there might have been additional income from nontaxable sources during that time, increasing the amount of appellant's income, and that he had ascertained that information from conversations with appellant. However, apart from this purely speculative, unsubstantiated statement, there was no evidence whatever that there actually was any such additional income. Hence we think that the testimony of Kulbarsh may be considered as additional ·evidence that appellant had no such resources as would account for the accumulation of the vast amount of currency which Hirsch testified he saw, and appellant told him

amounted to $225,000. Under these circumstances we find the cases relied upon by appellant in support of his contention as to the "uncorroborated admission" inapplicable.[1] We hold that there was ample evidence apart from appellant's extrajudicial admissions to furnish the starting point for establishing his net worth. See Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed 876.

█ Appellant further contends that, assuming that there was evidence of black market operations sufficient to sustain a charge of unreported income, such income must be attributed to the corporation which sold the meat, and not to himself. He relies upon the case, Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884, involving the question whether embezzled money constitutes taxable income to the embezzler. There, a bookkeeper who retained moneys paid for services rendered by the corporation by whom he was employed, was convicted of embezzlement, and the Court held that he was not liable for income taxes on those embezzled funds. Here, there was no question but that the corporation received full payment for all meats sold by it, and the additional income to appellant resulted from the collection of what was in effect a premium for such sales by the corporation which he controlled as president and principal stockholder. We need not decide whether the corporation was entitled to recover those additional payments. However, even if it were shown that appellant collected as agent for the corporation, it would not necessarily follow that there would be no liability on his part for attempted evasion of the taxes due on such collections. See United States v. Currier Lumber Co., 70 F.Supp. 219. Hence we find the Wilcox case no authority for holding appellant not liable for the tax evasion here charged.

We think there is ample evidence of record to sustain the Government's contention that appellant during the year 1943· made expenditures greatly in excess of his de-

---

[1] Naftzger v. United States, 8 Cir., 200 F. 494; Gulotta v. United States, 8 Cir., 113 F.2d 683; Pines v. United States, 8 Cir., 123 F.2d 825; Tabor v. United States, 4 Cir., 152 F.2d 254; Yost v. United States, 4 Cir., 157 F.2d 147.

clared available resources, and that he had available for that year sources of income with which to make such expenditures, even though appellant disputed that evidence and introduced his own evidence to explain the facts otherwise. His mode of carrying on his business operations, obviously calculated to conceal their magnitude and prevent investigation thereof, amply justifies an inference of willful attempt to evade payment of tax in violation of section 145(b) as charged. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418; Gleckman v. United States, 8 Cir., 80 F.2d 394; Chadick v. United States, 5 Cir., 77 F.2d 961.

Judgment affirmed.

MINTON, Circuit Judge, concurs in the result.