**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Metro M. HOLOVACHKA, Defendant-
Appellant.**

**No. 13717.**

United States Court of Appeals
Seventh Circuit.

Feb. 18, 1963.

Rehearing Denied March 28, 1963.

Rehearing Denied March 28, 1963,
En Banc.

Robert J. Downing, Chicago, Ill., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Norman Sepenuk, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C. Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., Joseph M. Howard, Vincent P. Russo, Donald A. Hansen, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

HASTINGS, Chief Judge

Metro M. Holovachka, defendant-appellant, was charged on January 12, 1962 in a 3-count indictment with violation of Section 7201 of the Internal Revenue Code of 1954.[1] The indictment charged that defendant willfully attempted to evade and defeat his income taxes for the years 1955, 1956 and 1957 by filing false and fraudulent tax returns. The indictment alleged that defendant had reported an income tax liability of $11,-893.81 for 1955, $10,486.75 for 1956 and $16,850.87 for 1957, whereas his correct tax liability for those years was $22,151.-54, $31,523.91 and $24,893.48, respectively.

Following a jury trial lasting three weeks, defendant was found guilty on all three counts. The district court imposed concurrent sentences of imprison-

---

1. Title 26 U.S.C.A. § 7201: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

ment for three years on each of the three counts and a fine of $10,000 on Count One. This appeal followed.

The instant indictment was returned and the trial was held in the United States District Court for the Northern District of Indiana, in the city of Hammond, Indiana.

The record shows that defendant was born in Gary, Indiana in 1908, the son of immigrant parents from Czechoslovakia. He was educated in the Gary public schools, attended Purdue University and was graduated from the Washington College of Law in Washington, D. C. He was admitted to the bar and has been practicing law in Gary since 1936. He served as city controller of Gary during 1952. He was elected to and held the office of prosecuting attorney of Lake County, Indiana from January, 1953 through December, 1958.

Defendant lived in Gary, was married and had one son, Demetri, age 23 years. His aged mother was living in Gary at the time of the trial. His sister, Dr. Anne Hopwood, was practicing medicine in Owensboro, Kentucky. His father-in-law, Rev. Alexander Papp, was an ordained priest of the Eastern Rite Catholic Church.

The indictment charged that defendant had attempted to evade federal income taxes by understating his and his wife's taxable income. The theory of the Government's case was that there were large annual increases in defendant's net worth in 1955, 1956 and 1957; that the only reasonable explanation for these increases was that they represented current taxable income; and that the amounts of taxable income proved at the trial were considerably greater than the amounts reported by defendant in his tax returns. This was a typical net worth case.

The errors relied upon for reversal may be generally characterized as concerning the method of impaneling and sequestering the jury; whether the evidence was sufficient to support the jury verdict; and various rulings of the trial court on evidence, motions and instructions before and throughout the trial.

I.

Defendant was first indicted on May 21, 1961 by a grand jury at Hammond charging tax evasion violations for the years 1955 and 1956. On September 28, 1961, the grand jury returned an additional indictment against defendant for the year 1957.

On June 26, 1961, defendant filed a preliminary motion to suppress certain evidence and to inspect the grand jury minutes. This motion was denied by the trial court.

The basis of this motion was that defendant, while serving as prosecuting attorney of Lake County, Indiana, was subpoenaed to produce certain personal records before the Senate Select Committee on Improper Activities in the Labor or Management Field (McClellan Committee). Defendant alleged that during the period he was under subpoena (May, 1958 until June, 1959), there appeared a series of sensational and inflammatory newspaper articles, headlines and photographs in Gary, Hammond and Chicago newspapers concerning his appearance before the McClellan Committee. Defendant alleged that the result of such publicity was to compel him, as a public official, under the "duress of public pressure," to provide his books and records to the McClellan Committee in violation of his rights under the Fourth and Fifth Amendments, which records and information were subsequently used in connection with the instant prosecution.

Government aptly points out that the motion, on its face, was insufficient to warrant granting the relief sought. It did not identify either the records defendant produced before the McClellan Committee, or the records, and information allegedly obtained therefrom, which he wished to have suppressed. Defendant's motion was based "upon information and belief" and stated that these unspecified records were presented to the grand jury. He claimed it was neces-

sary for him to examine the grand jury minutes in order to prove the allegations of his motion.

Such a motion hardly rises to the standard required to break the secrecy of grand jury proceedings. Pittsburgh Plate Glass Co. v. United States, 360 U. S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); United States v. Greenberg, D. C.S.D.N.Y., 204 F.Supp. 400, 403 (1962); United States v. Sugarman, D.C.R.I., 139 F.Supp. 878, 881 (1956); United States v. American Medical Ass'n, D.C.D.C., 26 F.Supp. 429, 431 (1939). Cf. United States v. Nunan, 2 Cir., 236 F.2d 576, 594 (1956), cert. denied, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665; United States v. Molasky, 7 Cir., 118 F.2d 128, 132 (1941), reversed on other grounds sub nom., United States v. Ragen, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383 (1942).

Section 134(a) of the Legislative Reorganization Act of 1946, 60 Stat. 831, 2 U.S.C.A. § 190b(a), provides in pertinent part:

"Each standing committee of the Senate, including any subcommittee of any such committee, is authorized to hold such hearings, to sit and act at such times and places during the sessions, recesses, and adjourned periods of the Senate, to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents, to take such testimony * * * as it deems advisable. Each such committee may make investigations into any matter within its jurisdiction * * *."

It appears without question that the McClellan Committee was authorized by law to issue subpoenas directed to defendant and his records and that there was no deprivation of his rights under the Fourth Amendment.

The record shows that when defendant appeared before the McClellan Committee he refused to answer certain questions on the ground that the Committee lacked authority to inquire into such matters, and the following exchange then took place:

"The Chairman: Do you object on the ground that a truthful answer thereto might tend to incriminate you? I want to get the record clear.

"Mr. Holovachka: No, sir."

■■ Defendant is correct in stating that the Fifth Amendment protects against the compulsory production of private books and records, Boyd v. United States, 116 U.S. 616, 633–635, 6 S.Ct. 524, 29 L.Ed. 746 (1886). However, by failing to invoke the privilege, defendant waived any rights afforded him under the Fifth Amendment. United States v. Murdock, 284 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210 (1931).

Defendant further contends that he was prejudicially restricted at this point from establishing the relationship between the activities of the McClellan Committee and the Internal Revenue Service to the events in the instant case. He predicates this curious argument on an expression found in a resolution offered in the Senate, and adopted, on January 25, 1962, authorizing Sinclair, a former Committee staff member "to testify in a criminal case [the instant case] pending before the U. S. District Court for the Northern District of Indiana, *which grew out of an investigation by the Select Committee.*" (Emphasis added.)

■ From this resolution defendant argues that the "facts clearly suggest and establish a concert of action between the Senate Committee and the Internal Revenue Service." We think defendant's conclusion in this regard is without substance. Assuming, *arguendo*, that it should be seriously considered, we are unable to discern anything illegal or improper in cooperation between the Executive and Legislative arms of the government. We fail to see any deprivation of constitutional rights arising out of such co-operation in the situation under consideration.

We hold that the district court did not err in denying defendant's motion to sup-

press and to inspect the grand jury minutes. The trial court did not abuse its discretion in so ruling. Although this motion was filed prior to the return of the count for the year 1957, it was considered as addressed to this additional charge.

On June 26, 1961, defendant filed a motion for a bill of particulars addressed to the original indictment concerning the years 1955 and 1956. This was allowed to stand as to the subsequent count for 1957.

In this motion, defendant requested particulars and details concerning the Government's claim of unreported income, disallowed deductions or exemptions and net worth statements upon which the prosecution was to be based.

In response to such motion, Government informed defendant that it proposed to prove his correct taxable income and income tax liability for each year covered by the indictment by the net worth plus non-deductible expenditure method of proof. The trial court denied the motion for a bill of particulars in the light of Government's disclosure of its theory of the case. Blackwell v. United States, 8 Cir., 244 F.2d 423, 426 (1957), cert. denied, 355 U.S. 838, 78 S.Ct. 49, 2 L.Ed.2d 50.

We hold that the action of the trial court in so ruling was within the exercise of its sound discretion allowed under Rule 7(f), Federal Rules of Criminal Procedure, 18 U.S.C.A.[2] "The application for a bill of particulars is one addressed to the sound discretion of the court, and, there being no abuse of this discretion, its action thereon should not be disturbed." Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545 (1927); United States v. Doyle, 7 Cir., 234 F.2d 788, 794–795 (1956), cert. denied, 352 U.S. 893, 77 S. Ct. 132, 1 L.Ed.2d 87; Hooper v. United States, 10 Cir., 216 F.2d 684, 686 (1954); Remmer v. United States, 9 Cir., 205 F. 2d 277, 281–282 (1953), rev'd on other grounds, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654; United States v. Caserta, 3 Cir., 199 F.2d 905, 910 (1952); United States v. Chapman, 7 Cir., 168 F.2d 997, 999 (1948), cert. denied, 335 U.S. 853, 69 S.Ct. 82, 93 L.Ed. 401.

Defendant was not surprised or prejudiced during the subsequent trial because of this denial. Government, with commendable fairness, entered into a pretrial stipulation of facts containing 34 specifications and covering numerous exhibits, as evidenced by Government's Exhibit 63. This proved to be a broad disclosure of its case. Government has demonstrated to our satisfaction in its brief that by using the information contained in the stipulation it was possible to substantially reconstruct the entire net worth statement it relied upon in the trial. We find no abuse of discretion on the part of the trial court in denying defendant's motion for a bill of particulars. Under the record before us, we find no occasion to adopt the more "liberal" rule defendant urges upon us.

Following the denial of the foregoing motions filed by defendant, the case was set for trial on November 13, 1961 and trial was commenced on that date.

When the case was first called for trial on November 13, 1961 defendant filed a motion to strike the jury panel because of a newspaper article published in Hammond the preceding day which he considered prejudicial to a fair trial. In support of such motion defense counsel stated to the court:

"We think that it is again, in view of the results of this jury selection, the number of people from Hammond, and the number of people from this one precinct, it is a basis indicating that the defendant can not get a fair and impartial trial from this Jury and we ask again that this jury be dismissed and a new panel selected."

Following that motion, and after 29 jurors had been questioned on the *voir*

---

**2.** Rule 7(f). "Bill of Particulars. The court for cause may direct the filing of a bill of particulars. * * *"

*dire* examination, defendant again moved to quash and dismiss the entire jury panel and venire called on the ground that the jurors were not properly drawn as required by 28 U.S.C.A. §§ 1861–1869. When it became apparent that the names of the prospective jurors had been selected primarily from "P. T. A." lists, Government joined in defendant's motion.

On November 14, 1961, the trial court dismissed the entire jury panel and reset the case for trial for January 22, 1962. The trial court ordered a new panel of 75 persons residing in that part of the Hammond Division, consisting of Lake and Porter Counties, Indiana, drawn for use in the trial on January 22, 1962.

In the meantime, on January 12, 1962, a new grand jury returned a superseding indictment and, by agreement of the parties, all previous motions and proceedings were ordered made a part of the record. Subsequently, on motion of Government, the original indictments were dismissed after the arraignment and plea in the instant case.

On January 12, 1962, the day the superseding indictment was returned, one of the local newspapers in Hammond printed another article concerning defendant in much the same tenor as the one previously objected to. While the parties were in court on that date defendant was granted a further delay and the trial was reset for January 29, 1962. At that time the trial court discussed with the parties the subject of an impartial trial before an impartial jury and suggested the possibility of removing the trial to Lafayette, Indiana. Lafayette is another place for holding court in the Northern District of Indiana and is about 100 miles distant from Hammond. Defendant objected to this removal and insisted on his right to trial in Hammond, in his home county, and again expressed his concern about the problem of newspaper publicity in that community. Since defendant did not agree to the change of venue, it was not ordered.

On January 17, 1962, the district court, *sua sponte*, dismissed the entire panel of petit jurors drawn January 2, 1962 over objection of defendant. The district court then ordered a new list of jurors drawn from those jurors residing in the South Bend and Hammond Divisions and ordered the exclusion therefrom of those who resided in Lake and Porter Counties, the areas where the alleged prejudicial newspaper articles had circulated. Defendant objected to the dismissal of the petit jury drawn January 2, 1962 and moved to quash and dismiss the entire panel, venire and petit jury drawn on January 17, 1962 on the ground that he was thereby denied the right to a fair and impartial jury trial. The Northern District of Indiana is divided into the Fort Wayne, South Bend and Hammond Divisions. 28 U.S.C.A. § 94.

On January 23, 1962, with the parties and counsel present in court, the trial court denied defendant's motion to quash the jury panel drawn January 17, 1962. In making its ruling the trial court reviewed at length the prior record in the case relating to newspaper publicity and impartial jurors. It took note of the recent decision of United States v. Accardo, 7 Cir., 298 F.2d 133 (1962), and of 28 U.S.C.A. § 1865.[3] The trial was ordered to proceed on January 29, 1962 with the jury to be selected from the panel drawn on January 17, 1962.

Defendant contends that he was "biased, prejudiced and deprived of a fair and impartial jury trial by the arbitrary action of the court." We think the most effective answer to this charge of arbitrary action by the trial court is to quote in the margin the reasons given by that court for its ruling.[4] We find

---

**3.** § 1865(a) provides: "Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. * * *"

**4.** "* * * in a careful study of the opinion of the Seventh Circuit Court of Appeals [United States v. Accardo, supra]

no error or abuse of discretion in this ruling. We do find that the trial court went to every permissible length to insure defendant a trial by a fair and impartial jury.

■ Subsequently, the trial court denied defendant's further motion to dismiss the instant indictment on the ground that the new grand jury which returned the superseding indictment contained residents of Lake and Porter Counties. This denial was proper and we find no error in this ruling.

When the case was called for trial on January 29, 1962 one of defendant's first moves was to call the trial court's attention to recent newspaper publicity in Gary and Hammond newspapers claimed to be prejudicial and he then moved for a three months continuance. The motion was denied.

■ Thereupon the jury of twelve men and women and four alternate jurors were impaneled and sworn. The trial court, *sua sponte*, then ordered that the jury remain together until the conclusion of the trial over objection of defendant. This order of sequestration was preceded by an explanation to the jury of the trial court's reasons for making it. Defendant's objections were overruled and we find no error. Again, we believe the best answer to defendant's claim of prejudice is to set out in the margin the

and of recent and earlier pronouncements by the Supreme Court of the United States that I feel brought into sharp focus the accumulation of events in the case before us that led up to this Order of January 17, 1962, and these decisions by these Courts caused us to re-examine or reevaluate our own proceedings in this cause with a renewed determination to do what we can to insure to the Defendant an impartial trial before an impartial Jury. I think it is agreed by all that it was quite clear at the conference that we have already referred to that if the Defendant had made a motion on his part to transfer the place for holding this trial, that that motion would have been granted; but the Defendant, as is his right and was his right, chose not to make such a motion and in the absence of such a motion it became obvious to this Court that in light of the repeated protestations of the Defendant himself through his able Counsel in this cause leading up to and including the re-write of the alleged objectionable material that came on the day that the superseding Indictment was returned, it seemed obvious to this Court that further action immediately be taken to insure an impartial Jury.

"Referring again to Section 1865, it says that Grand and Petit Jurors shall from time to time be selected from such parts of the District as the Court directs so as to be most favorable to an impartial trial and not to incur unnecessary expenses or unduly burden the citizens of any part of the District with Jury service; if we drew several hundred people as prospective Jurors from this Hammond area, the area served by these newspapers about which the Defendant

has complained, this Court would feel, in light of these new pronouncements of the Circuit Court of Appeals, that we would have to go a long, long way in excusing anybody as a Juror who had been following these stories about which the Defendant complained. This would have been the kind of an unjust expense as contemplated by this Section 1865. Likewise it would create an unnecessary expense within the meaning of that section of the Code to bring prospective Jurors in from the Fort Wayne Division of this Court, an area some 150 miles and more, in many places, from this Hammond Court Room.

"One obvious conclusion remained, and that was to exclude from the Order for the Jury to be called for duty in this case, the citizens from the Lake County and Porter County area that in the past have served to supply Jurors for this Court, and also to exclude from the Order those Jurors who live at the farthest and most remote parts of the District because of the expense involved in that long travel.

"Accordingly it was, on the 17th of January at the time this Order was entered, in the opinion of this Court necessary to provide an impartial Jury, a Jury that would be most favorable to an impartial trial, and furthermore so as not to incur unnecessary expenses or unduly burden the citizens of any part of this District with Jury service that this Court on the 17th of January entered that finding, and the Order that ensued.

"This Court is of the same opinion still. Nothing by the Defendant has pointed to the contrary. The motion of the Defendant to quash the panel is denied."

exact language of the trial court in this regard.[5] The trial court further ordered that the court continue in session six days a week.

Defendant charges that sequestration of the jury was coercive in its effect on the verdict of the jury. We do not agree.

Both parties cite many decisions in support of their contentions relative to the method of selection and the sequestration of jurors. There is no dispute about these holdings. We need not review them here.

It is quite clear to us, as it was to the trial court, that because of the local prominence of defendant, the problem of adverse newspaper and other publicity was to be an important factor in defendant's trial strategy. This was a proper element for defendant to consider. It is equally apparent to us that the trial court's decision to sequester the jury, designed as it was to insulate the jurors from local prejudice, was a sound exercise of its discretion. Holt v. United States, 218 U.S. 245, 250–251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Janko v. United States, 8 Cir., 281 F.2d 156, 170 (1960), reversed on other grounds, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (1961); Kleven v. United States, 8 Cir., 240 F.2d 270, 273 n. 1 and cases cited therein (1957); Tinkoff v. United States, 7 Cir., 86 F.2d 868, 879 (1936), cert. denied, 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346.

5. "Ladies and Gentleman of the Jury, I should like to ask your careful attention to a statement that the Court has prepared and wants now to make to you, the members of this Jury.

"The Court has given long and careful consideration to the necessity for the action which we are about to take in this case. In arriving at the course of action we have weighed all of the factors in favor of safeguarding the rights of the parties to a fair and impartial trial and to preventing embarrassing incidents to the members of the Jury as well and, of course, the inconvenience to the individual Jurors.

"After a careful consideration of all of the fore-going, after the selection of the Jury and the four alternates, and after they were duly administered the oath to try the case, and before any adjournment, before the opening statements, and before the introduction of any evidence, the Court now on its own motion, without the sanction or request of either the Government or the Defendant, in fact without consultation with either side, the Court now Orders this Jury and the four alternates to remain together in a body until you are discharged from your further consideration of this case, or until further Order of this Court, and until discharge of the Alternates as provided by law when the Jury retires to deliberate.

"The United States Marshal has arranged for separate adequate and comfortable lodging accommodations for the male Jurors and adjacent lodging accommodations for the male officers sworn to attend them, and separate and adequate and comfortable lodging accommodations for the women Jurors and adjacent lodging accommodations for the women officers sworn to attend them, and the Marshal has also arranged all necessary transportation for the Jury during the trial of this cause.

"The United States Marshal and his deputies who have been sworn to attend this Jury are directed to arrange for the necessary reading material as requested by the Jurors, such as newspapers, magazines, and the like, but before delivery to the Jurors the Court Orders that such officers delete therefrom any printed matter therein concerning the trial of this case.

\*    \*    \*    \*    \*

"The Jury is Ordered not to communicate with anyone nor to permit anyone to communicate with you except among yourselves, the officers who are in charge of the Jury, your immediate family and possibly with reference to your business and/or employment, but then only in the presence of the Marshal or one of his deputies. However, you should not communicate among yourselves or with anyone at all about this case.

"You are instructed to refrain from listening to or watching any news programs on radio or television. As stated before, newspapers will be provided you after any news stories concerning this trial shall have been first deleted. You will also abide by all oral directions concerning your conduct as Jurors which have been given you by the Court during the day on your voir dire examination which has just been completed."

District courts and courts of appeal have an awareness of the ever increasing problems inherent in conducting a jury trial in the spotlight of publicity. Cf. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); United States v. Accardo, 7 Cir., 298 F.2d 133 (1962). Modern forms of news media, in the proper exercise of their functions, have made it necessary for the courts to reappraise the elements creating the atmosphere in which one charged with a crime is given his right to a fair and impartial public trial by jury. Reasonable solutions will be found by the courts as varying situations are presented for review.

In this case the trial court caught the swing of the pendulum at one end of its sweep. Our careful scrutiny of the record leads us to the positive conclusion that the steps taken in selecting and sequestering the petit jurors were dictated solely by the trial court's deep concern for defendant's constitutional rights. Defendant's rights were not prejudiced by the actions of the trial court; they were preserved for him in every reasonable way short of trial in a vacuum.

In sum, we hold that there was no prejudicial error in this cause preliminary to the introduction of evidence.

## II.

Defendant contends the evidence is not sufficient to support the verdict of the jury finding him guilty on all three counts of the indictment. We have reviewed the evidence in the light most favorable to Government, as we are required to do on this appeal. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Accardo, 7 Cir., 298 F.2d 133, 135 (1962); United States v. Achilli, 7 Cir., 234 F.2d 797, 803 (1956), aff'd 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918. It is our fixed conclusion and considered determination that there was more than a substantial basis on this record to justify the guilty verdict. Of this we have no doubt.

In passing, we observe from defendant's brief and oral argument that his arguments on the evidentiary question are presented by viewing the evidence in the light most favorable to himself.

The transcript of the testimony and documentary evidence is voluminous. We shall not attempt to recite it in detail here. We shall give attention to some of the salient points concerning which there is dispute.

The testimony concerning the preindictment investigations conducted by the revenue agents established the necessity for the adoption of the net worth method. Defendant's records were wholly inadequate to serve as a basis for determining his correct income tax liability. Defendant's lack of memory and apparent discrepancies in some of his statements served to shed little light on his professional and business transactions or the sources of his income.

Government used December 31, 1951 as the starting point for its net worth computation in order to establish the pattern of underreporting followed by defendant down through the critical years 1955, 1956 and 1957. Defendant was interviewed a number of times by the revenue agents. He first explained that the net worth increases in 1952 and 1953 were due to a cash loan of between fifteen and twenty thousand dollars he had received from his father prior to 1952. He could not recall any amounts of cash on hand which he had at the end of 1951 or 1952. He said he had received no other funds from a non-taxable source.

Defendant afterwards stated to an agent that except for a few canceled checks he had previously furnished, he had disposed of all his canceled checks during the years 1954 through 1958. He then stated that the loan from his father amounted to $27,500 and that he received it in three installments during 1952 and 1953. He told the agent he had received nothing from his wife's relatives. Yet, about three months later he said that in 1952 or 1953 his wife had given him $20,000 which she had received as a gift from her parents. He

**354**

subsequently told the agent that this $20,000 was spent by him in 1955 on the construction of a new house.

Defendant reported professional net income of $24,566.70 in 1955, $22,355.74 in 1956 and $33,724.97 in 1957. When asked to exhibit his records supporting these figures he made available the books and records maintained in his Gary law office by his secretary. The legal fees reflected in these office records revealed $2,736.86 in 1955, $1,388.08 in 1956 and $2,314.54 in 1957. To explain this discrepancy of more than 90% between the totals in his tax returns and the totals in his office books, defendant stated he had kept his own private records of professional income received outside his Gary office, but that these records had either been lost or stolen.

He subsequently told the agents he had had substantial amounts of cash on hand at times during the period under examination, but he could not recall either the amounts or the time when he possessed such cash. He could not recall the source of his income appearing on his 1953 and 1954 returns, including $12,000 in "Miscellaneous Income" in his 1953 return.

Government prepared and introduced in evidence its net worth statement visually portraying defendant's tax deficiencies for the three years involved. Defendant prepared and introduced a counter net worth statement for the same period substantially negating the net worth increases in Government's statement. The jury could have reasonably accepted the Government's statement as true and established by the evidence and would have been justified in rejecting the contrary items in defendant's statement.

(1) *Cash on hand.* Government allowed no cash on hand. Defendant could not state when or how much cash he had on hand. The evidence established that defendant's wife had no appreciable separate income. From 1945 to 1951, when defendant was claiming five dependents, he reported an average annual adjusted gross income of about $4,800. Defendant and his wife borrowed substantial

amounts of money from financial institutions and other sources in 1940, 1943, 1950 and 1953. He admitted he did not borrow when he had cash on hand. Although during the investigation defendant claimed to have large, undisclosed amounts of cash on hand prior to 1955, his own net worth statement reflected only the monies which he and his wife allegedly received from their respective parents. The jury was warranted in crediting Government's version of this proposition.

(2) *Alleged $27,500 loan from defendant's father.* Defendant testified he did not recall whether any part of the $27,500 borrowed from his father in 1952 and 1953 remained on hand during either of those years or in 1954. There was credible evidence from which the jury could have believed and found that defendant's father could not have accumulated that much money to make such a loan. His earnings were meager prior to his retirement in 1941, and he had no substantial employment thereafter. Defendant claimed his father and mother as dependents on his federal income tax returns for the years 1945 through 1951. Defendant wrote a letter to the Internal Revenue Service in 1952 stating his parents had an income of less than $50 per month. He never repaid the alleged loan to his father. His sister contributed to the support of the parents. His father died in 1953.

(3) *Alleged $20,000 gift to defendant's wife.* Late in the investigation by the agents, defendant for the first time reported that his wife received a gift of $20,000 in currency from her mother shortly before her mother's death in 1953. Defendant's wife was not called to testify at the trial. Defendant's father-in-law, Father Papp, testified that in June, 1953 he was present when his wife made a gift of $20,000 in currency to their daughter, defendant's wife, to be used for the purpose of building a home. On cross-examination, Father Papp admitted that he had never before seen this $20,000 in currency and that his wife had never informed him that she had it. It

was further brought out that the witness had stated before the grand jury he did not know of this occurrence of his own knowledge but had relied on his wife's statement to that effect. Treating this testimony in a charitable manner, the jury could have reasonably concluded that Father Papp was mistaken. It could have believed that such a gift was never made.

(4) *Alleged $14,745 loan to defendant's nephew.* Defendant's nephew, Michael Ksenac, testified that in 1957 he paid $14,745 for a new house in Gary, and that he had received the entire sum in currency as a loan, allegedly arranged by defendant. He said he later learned the money came from his grandmother (defendant's mother), who resided with him. Defendant testified that the money was loaned by his mother who wanted to keep it a secret from another grandchild. Ksenac was repaying the loan in installments by making deposits to defendant's credit in a local savings account. Defendant testified he was keeping this money for his mother but had never paid any part of it to her. There was credible evidence from which the jury could have believed that defendant's mother would not have had $14,745 in currency in 1957 and that she did not furnish the money to defendant for that purpose. It is conceded that at the time of the trial defendant's mother could not be called to testify because of her advanced age and illness.

(5) *Alleged $16,000 loan from Judge Murray.* Defendant testified that on May 20, 1956, at a time when he was prosecuting attorney of Lake County, Indiana, he borrowed $16,000 from Judge William J. Murray, who was then Judge of the Criminal Court of Lake County. He introduced in evidence a promissory note reciting such a loan. On the note, written in pencil, was a notation that it was repaid on March 3, 1958. Defendant's net worth statement reflected this alleged loan as a liability for the years 1956 and 1957. Judge Murray died in December, 1959. Defendant did not recall whether he received the loan by check or in cash or for what purpose he used the money. He allegedly repaid the loan in cash and had no other evidence of such repayment except the unsigned pencil notation. Although he claimed to have the need to borrow this money on May 20, 1956, there was evidence that on the same date he and his wife loaned $8,000 to one Kampo. Shortly after giving his testimony about the loan from Judge Murray, defendant testified on cross-examination that he had met Judge Murray's son who said to defendant he could not believe the story because his father did not have $16,000 to lend anyone and that his mother did not know about it. Prior to the trial, defendant had never reported such a loan to the investigating agents or claimed such a loan as a source of cash receipts. The jury was reasonably justified in rejecting defendant's testimony and in concluding that such a loan was never made.

(6) *Barrett Bonds.* Defendant purchased for his own investment purposes certain Gary street improvement contracts and bonds, known as Barrett Bonds. He purchased $31,109.98 in 1952, $156,148.66 in 1953 and $9,940 in 1957. During the years 1953 through 1957, defendant received a total of $168,341.03 with respect to this investment, representing repayment of principal and earned interest. It is admitted that the interest on such bonds is non-taxable. Government and defendant remain in sharp disagreement as to the proper manner in which these repayments of principal and interest should be reflected in the net worth statement.

Government treated the principal repayments as a tax free return of capital which correspondingly decreased defendant's investments in such bonds for those years. The yearly interest payments received on these bonds were considered to be tax free and were accordingly deducted from defendant's net worth. The trial court properly instructed the jury that the repayments of principal and the earned interest constituted non-taxable income.

Defendant asserts prejudicial error in the trial court's denial of his right to introduce his own net worth statement presenting a different theory of the case with respect to the return of his principal investment in the Barrett Bonds. Defendant sought not only to reduce his annual running investment in these bonds to the extent of the principal payments received each year, as was done by Government, but also to deduct such amounts from his net worth in order to arrive at his correct taxable income. Defendant asserts that such annual returns of principal received on these bonds each year must be deducted in the "Adjustments" portion of the net worth statement, as was done with the non-taxable bond interest.

■ The trial court properly sustained Government's objection to defendant's method of accounting on the ground that under defendant's theory he would be erroneously permitted to deduct the yearly returns of his principal investment from his net worth. To that extent, defendant would produce a net worth decrease. The trial court properly held that the Barrett Bonds should be treated in the net worth statement in the same manner as other assets appearing therein, at their absolute annual cost. There was no error in rejecting defendant's offer of his original net worth statement based on this erroneous theory. United States v. Kiamie, 2 Cir., 258 F.2d 924, 933 (1958), cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 230; Clark v. United States, 8 Cir., 211 F.2d 100, 105 (1954), cert. denied, 348 U.S. 911, 75 S. Ct. 289, 99 L.Ed. 714. Defendant then recast his statement in the light of this ruling and such net worth statement was properly received in evidence.

(7) *Lovelace transaction.* This transaction concerns whether an asset of approximately $11,000 allegedly acquired in 1948 or 1949 should be included as an asset of defendant in the net worth statement. Defendant claimed to have purchased real estate from his parents and then to have resold it on contract to Lovelace. Without detailing the facts, which we have carefully reviewed, it is our conclusion that the jury was warranted in finding that the beneficial interest in the property remained in defendant's parents, even though in form defendant ostensibly owned the real estate. Government did not err in excluding this as an asset of defendant.

(8) *Campaign expenditures.* Government included in its net worth statement as non-deductible, personal expenditures for the years 1952 and 1954 the sums expended by defendant for election expenses in his campaign for Lake County Prosecutor. This amounted to $4,152.90 in 1952 and $10,994.64 in 1954. This was based on defendant's sworn statement of his campaign expenses filed pursuant to law.

Defendant contends that none of these expenses were in fact expended from his own resources but that all were contributed by his friends. Defendant was unable to produce any records supporting such a claim or furnish the agent with the name of any individual contributor.

The jury could have reasonably credited Government's contention on this item.

(9) *Other items.* Aside from the treatment of an item of $1,000 related to a transaction involving the State-Sibley Corporation and an alleged gift of $1,500 by defendant to his son, Demetri, the foregoing items represent the major differences in Government's and defendant's net worth statements. The last two minor items appear to have been properly treated by Government.

■ In conclusion, we hold that the net worth statement prepared by Government correctly revealed the failure of defendant to report taxable income of $18,718.06 in 1955, $22,329.43 in 1956 and $15,885.07 in 1957, and that under the record in this case the jury was warranted in so finding.

### III.

Contrary to defendant's contentions, we hold that Government discharged its burden of establishing beyond a reasonable doubt the elements essential to conviction in a net worth case.

■ It was established beyond a reasonable doubt that there was a substantial tax due and owing from defendant for the years in question. "[I]t is not necessary to prove the exact amount of deficiency averred in the indictment. It is sufficient to prove that a substantial amount of tax liability has been willfully averted." United States v. Doyle, 7 Cir., 234 F.2d 788, 794 (1956), cert. denied, 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87; United States v. Achilli, 7 Cir., 234 F.2d 797, 805 (1956), aff'd, 353 U.S. 373, 77 S.Ct. 995, 1 L.Ed.2d 918.

Defendant concedes an underreporting of income of $6,106.09 for the year 1956. He offered his own net worth statement and examined the revenue agent with reference to each of the items in the net worth statements in dispute. Government followed the same pattern. It became a question of fact for the jury to decide. We need not further review the evidence on this score.

It was established beyond a reasonable doubt that the tax deficiencies arose from some taxable source of income. Holland v. United States, 348 U.S. 121, 137, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In the instant case, Government adequately negated "all the possible nontaxable sources of the alleged net worth increases— gifts, loans, inheritances, etc." Id. at 137, 75 S.Ct. 136. Government adequately demonstrated through its proof of defendant's financial history prior to the net worth starting point that there was no likelihood of any previously accumulated cash hoard.

In United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958), the Supreme Court announced the following interpretation of the holding in Holland relating to the necessity of "Proof of likely source" of income:

"* * * In Holland, we held that proof of a likely source was 'sufficient' to convict in a net worth case where the Government did not negative all the possible nontaxable sources of the alleged net worth increase. This was not intended to imply that proof of a likely source was

necessary in every case. On the contrary, should all possible sources of nontaxable income be negatived, there would be no necessity for proof of a likely source. * * *"

After offering evidence to rebut defendant's explanations of his increased net worth, Government then turned to the only remaining source of income— his professional income from his law practice. As we have previously pointed out, here Government was frustrated because of lack of adequate records and was compelled to resort to the net worth method. In this case, "the Government's detailed investigation was a complete answer to the petitioners' explanations." Holland v. United States, supra at 136, 75 S.Ct. 135. Government's evidence on this proposition "was sufficient to convict."

■ The final essential element is that defendant had engaged in a willful attempt to evade and defeat the tax. Spies v. United States, 317 U.S. 492, 499–500, 63 S.Ct. 364, 87 L.Ed. 418 (1943). A fair statement of the rule is that willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income." Holland v. United States, supra, 348 U.S. at 139, 75 S.Ct. at 137.

As Mr. Justice Clark said in Holland:

"Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported an inference of willfulness, their verdict must stand." Id. at 139, 75 S.Ct. at 137.

This language applies with equal force to the case at bar.

We need not repeat the evidence showing defendant's failure to keep adequate records of his professional income in his law office books; the destruction or loss of the professional income record books

defendant kept privately outside his office; and the destruction of substantially all his canceled checks for the years 1954 through 1958. These matters were pertinent on the issue of concealment. Gariepy v. United States, 6 Cir., 189 F. 2d 459, 463 (1951); Yoffe v. United States, 1 Cir., 153 F.2d 570, 573–574 (1946).

■ Government established that defendant's financial transactions during the years 1952 through 1957 were carried on largely through the use of currency, totalling $342,919 in that period. Defendant's explanation was that this was a habit he acquired from his parents. He stated that the records disclosing the source of this substantial amount of currency were lost. This was a factor to be considered by the jury on the issue of willfulness. Schuermann v. United States, 8 Cir., 174 F.2d 397, 398 (1949), cert. denied, 338 U.S. 831, 70 S.Ct. 69, 94 L.Ed. 505; United States v. Chapman, 7 Cir., 168 F.2d 997, 999–1000, 1003 (1948), cert. denied, 335 U. S. 853, 69 S.Ct. 82, 93 L.Ed. 401.

■ There was considerable evidence, largely undisputed, of defendant's practice of causing certain assets owned by him to be placed in the names of certain corporations controlled by him and in the names of various relatives. Although defendant asserted this was not done to conceal his assets, it was another link in the chain of circumstances the jury might properly consider on this issue. Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943); Chinn v. United States, 4 Cir., 228 F.2d 151, 154 (1955).

Having in mind the admonitions of the Supreme Court in Holland v. United States, supra with reference to the rather strict requirements in the use of the net worth method in prosecution of tax-evasion cases, we conclude that those standards have been fully met in the case before us. The essential elements of the crime charged have been proved beyond a reasonable doubt by competent evidence and the jury was justified in so finding by its verdict.

## IV.

Finally, defendant claims prejudicial error in certain rulings of the trial court and by alleged misconduct of a Government attorney.

■ Government witness Sinclair, a former investigator for the McClellan Committee, testified concerning certain of defendant's records subpoenaed by the Committee. On cross-examination by defense counsel, in answer to a question concerning what he did with the information obtained from defendant, the witness stated that he "used it as a basis to testify before the Labor Rackets Committee in Washington, D. C. in June of 1959."

Defendant complained of the use of the word "Rackets" in the answer to this question. The trial court denied a motion for mistrial. There was no further use of the word in that connection and we find no reversible error in the ruling of the trial court.

Defendant claims error in the asking of three questions by Government which related to the McClellan Committee hearings. These were minute matters and in each instance the trial court sustained defendant's objections, struck the questions and answers and directed the jury to disregard them. There was no ground for a mistrial in this respect.

Defendant made no objection to any remarks of Government counsel during the closing argument. When the argument had concluded, defendant offered two objections. He claimed that on five separate occasions Government counsel expressed his personal belief on certain matters in the case. He further claimed prejudice when Government counsel stated his belief that the late Judge Murray would not violate the Code of Ethics by loaning defendant $16,000 when defendant was appearing before him as a prosecuting attorney.

We have examined all these allegedly prejudicial comments in the context in which they were made and find no prejudicial effect on the jury or on defendant's right to a fair trial. The jury was ade-

quately instructed at the beginning and end of the trial that statements made by counsel were not evidence.

Defendant asserts error on three items of evidence he claims were erroneously admitted by the trial court. We have examined these claims and find them to be inconsequential and without merit.

Defendant assigns as error other rulings of the trial court with reference to cross-examination of certain witnesses and the use of certain documents in such cross-examination. We have examined each of these contentions in the context of the record when made and find no prejudicial error in the challenged rulings of the court. The trial court extended defendant a wide latitude in his cross-examination of witnesses.

In examining the entire record in this case, we conclude that the trial judge made his rulings without bias or prejudice and with a determination to insure to defendant and Government a fair trial. We find his rulings on all propositions were uniformly correct in so far as any bitterly contested criminal trial lasting three weeks can be free of error. We find no prejudice was done to defendant.

Defendant charges that two instructions to the jury requested by Government and given over his objection and the refusal of the trial court to give fourteen instructions tendered by him constituted error.

Although not waiving his contention on the jury instructions, defendant does not seriously argue the matter, devoting less than one page of an otherwise voluminous brief to it. We have examined the record and after a careful review of the instructions given and refused find that the jury was adequately and fairly charged.

The trial court correctly charged the jury on the net worth method of proof and the essential elements of such proof as it related to the crime charged. Some of the instructions refused were covered by the court's own instructions. Some were modified and given, and others were properly refused. It is sufficient for us

to say that the jury was properly charged, and we find no reversible error therein or in the refusal of certain requested instructions.

Finding no prejudicial error and finding further that defendant received a fair trial, that the evidence of guilt warranted the jury's verdict and that substantial justice has been done, the judgment of conviction is affirmed.

Affirmed.